# EXHIBIT 7

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 128 OF 2021 (RPJ)**

**IN THE MATTER OF THE COMPANIES ACT (2021 REVISION)**

**AND IN THE MATTER OF SINA CORPORATION**

| | |
|---|---|
| **Appearances:** | Mr Stephen Atherton QC instructed by Ms Katie Pearson, Ms Gráinne King and Ms Moesha Ramsay-Howell from Harneys on behalf of the Company |
| | Mr Thomas Lowe QC instructed by Mr Sam Dawson, Mr Nigel Smith and Mr Mark Dowds from Carey Olsen on behalf of the Carey Olsen Dissenters |
| | Mr Robert Levy QC instructed by: |
| | Ms Farrah Sbaiti from Ogier on behalf of the Dissenters; |
| | Mr Rocco Cecere, Mr Zachary Hoskin and Ms Charlotte Walker from Collas Crill on behalf of the Dissenters; and |
| | Mr Simon Dickson, and Ms Ella van der Schans from Mourant on behalf of the Dissenters |

**IN OPEN COURT**

| | |
|---|---|
| **Before:** | The Hon. Justice Parker |
| **Heard:** | 14-15 December 2021 |
| **Draft Judgment Circulated:** | 14 January 2022 |
| **Judgment Delivered:** | 25 January 2022 |

**HEADNOTE**

*Cayman Islands company carrying on business in the People's Republic of China-merger of company-shareholders dissenting from merger on basis that fair value was not offered for their*



*shares-section 238 Companies Act - Directions for trial -Valuation Date-PRC laws-discretion and time for adjudication given Company engagement with authorities-practical matters relating to discovery-protocols-information requests and management meetings*

## JUDGMENT

### Introduction

1.      Sina Corporation (Sina or the Company) is an exempted limited company incorporated under the laws of the Cayman Islands. The Company, which was established in 1998, operates a leading online media business in the People's Republic of China (PRC), serving the PRC and global Chinese communities. In 2009, Sina launched the first 'Twitter-like' social media platform in the PRC, 'Weibo', which has apparently reached 361 million monthly active users and 159 million daily active users.

2.      Sina is the legal and beneficial owner of all of the issued and outstanding Class B ordinary shares of Weibo i.e., 45% of the shares in Weibo which carry with them 71% of the voting power.

3.      On 28 September 2020, the Company (acting by its Board) executed a merger agreement with a buyer group[1] for the purchase of the Company's shares at a price per share equal to the merger consideration of US$43.30 (the Merger Consideration). On 20 November 2020, notice of the Extraordinary General Meeting and proxies were sent to the Company's shareholders.

4.      Between 15 and 22 December 2020, dissenting shareholders sent to the Company their objections as required by section 238 (2) of the Companies Act.

5.      On 23 December 2020, the Merger Agreement was approved by a special resolution passed at an Extraordinary General Meeting of the Company by a two thirds majority (the EGM). On 12 January 2021, the Company gave formal notification of the approval of the Merger to the putative dissenting shareholders under or in accordance with section 238 (4) of the Companies Act. Between 13 and 26 January 2021 the dissenting shareholders (the Dissenters) notified the Company of their dissent in accordance with section 238 (5) of the Companies Act.

---

[1] New Wave  MMXV, New Wave Holdings Limited, New Wave Mergersub Limited and Mr Charles Chao



6.      On 22 March 2021, some 3 months after the EGM, the Plan of Merger was completed and filed with the Registrar of Companies of the Cayman Islands. The Certificate of Merger was issued by the Registrar on the same date and the merger became effective. As a result, the Company was de-listed from the NASDAQ and taken into private ownership.

7.      On 26 March 2021, the Company made a 'fair value' offer to the Dissenters solely for the purpose of section 238(8) of the Companies Act and without prejudice to the Company's position at any subsequent trial to determine the fair value of the Dissenters' shares. The fair value offer for the Dissenters' shares was (per share) in an amount equal to the Merger Consideration. The offer was rejected.

8.      On 18 May 2021, the Company presented a petition asking the Court to determine the fair value of the Dissenters' shares in the Company, pursuant to section 238 of the Companies Act together with a fair rate of interest, if any, on the amount to be paid by the Company to the Dissenters (the Petition).

**Issues for determination**

a)      Whether the valuation date (the Valuation Date) in respect of the Dissenters' shares ought to be the date on which the EGM was held and at which the Merger was approved (23 December 2020), or, alternatively, the date of the closing of the Merger (22 March 2021).

b)      The appropriate directions as regards discovery (in particular in relation to the provision by the Company of its relevant documents and information) given the new PRC legislation which serves to control (and in certain cases prohibit) the transnational dissemination of certain types of information held within mainland China.

c)      Whether the Company should be required to meet with the Dissenters, to discuss the parameters for its discovery exercise.

d)      Certain miscellaneous issues relating to information requests and management meetings on which the parties have been unable to reach agreement, and on which they seek the Court's determination.



**Valuation Date**

9.    Stephen Atherton QC for the Company contends that: (i) it is undeniably settled practice in proceedings under section 238 of the Companies Act that a dissenter's former shareholding is valued at the date of the EGM; (ii) the premise for that date is both logical and rational and ensures complete consistency and equality as between the date on which the terms of any merger (in particular as regards the relevant share purchase price) are approved and accepted by the majority of the company's shareholders and the date of 'the fair value' of the shares as determined by the Court in the context of proceedings under section 238 of the Companies Act.

10.   Robert Levy QC for certain Dissenters[2] argues that the Court  should direct the valuation experts to opine on the value of the Dissenters' shares in the Company as a going concern as at the Merger Completion Date (22 March 2021) as opposed to 23 December 2020, (the EGM Date). In a case such as this, where there is a gap of approximately 3 months between the EGM Date and the Merger Completion Date, he argues that the Court should order the use of the Merger Completion Date which accords with principle and the structure of the statutory regime.

11.   Tom Lowe QC for certain other Dissenters[3] also argues that the Court should order the use of the Merger Completion Date because this accords with a fair construction of the statutory regime. It is the date on which the majority of shareholders 'reap the benefits' of the merger plan, and therefore ought to be the date on which dissenters are also compensated. Furthermore, the Merger Completion Date normally triggers the obligation by the relevant company to pay the dissenters fair value, having forced dissenters to elect to forfeit their shareholder rights. He argued that it makes logical sense to use that date to establish the fair value of the shares. He adopted, on behalf of his clients, the submissions made by Mr Levy QC on all the other points argued.

**Analysis**

12.   The only Judgment in which the question of the appropriate valuation date has been expressly considered is that of Justice Jones in, *In the Matter of Integra Group* which was the first section 238 case which reached trial.[4]

---

[2] represented by Collas Crill, Mourant Ozannes and Ogier
[3] represented by Carey Olsen
[4] [2016] (1) CILR 192



13.    Jones J held as follows:

> "22    The Companies Law does not specify the date at which the determination of fair value is to be made. The order for directions made on October 27th, 2015 identified two potential valuation dates, namely April 23rd, 2014 (which was the date upon which the circular containing the merger proposal was sent to shareholders and published to the market) and May 21st, 2014 (which was the date upon which the EGM was held). Counsel ultimately agreed that the latter date should be adopted and this is consistent with both Delaware and Canadian law.

> **23    Under §262(h) of the Delaware General Corporation Law, dissenting shareholders are entitled to receive their pro rata share of the common stock of the company as it existed as of the merger date, exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation. This equates to the date of the EGM, namely May 21st, 2014.**

> 24    Under §190(3) of the Alberta Companies Act, dissenting shareholders are entitled to be paid the fair value for their shares on the last business day before the day on which the resolution from which the shareholder dissents was adopted. This equates to the last date upon which the respondents could have served their notices of dissent, namely May 20th, 2014.

> 25    The principle underlying the legislative approach in both these jurisdictions is reflected in what was said by Anderson, J. in Brant Invs. Ltd. (1) (42 D.L.R. (4th) at 50):

> "The basic ground upon which the dissenting shareholders took their position of dissent was objection to the impugned transaction. Because the manner of carrying that transaction forward involves a fundamental change within the meaning of the Act, they were accorded by the Act a right of dissent and a right to be paid 'fair value' of their shares. In my view they should have no enhancement in the value of their investment attributable to the transaction which gave rise to their dissent."

> I agree with this proposition and its converse, namely that the dissenting shareholders should not bear any dilution or diminution in the value of their investment resulting from the merger.

> **26    I agree with counsel that the date upon which a merger decision is made, in this case May 21st, 2014, is the logical date at which to determine the fair value payable to dissenting shareholders. This means that the fair value should be determined at the point immediately before the merger is agreed, disregarding the effects of the merger, whether it would have had a positive or negative effect upon the respondents had they continued to be shareholders of Integra**. I use the expression "the valuation date" to mean May 21st, 2014.



> 27        *In conclusion, the court is therefore required to determine the fair value of Integra's business as a going concern as at the valuation date, meaning at the point immediately before the merger was approved."[my emphasis]*

14.    In fact with regard to last sentence of §22*,* as Jones J himself noted in *Integra*, the dissenting shareholders in Delaware are entitled to fair value "*as of the merger date*" (at §23) which may well not be, as is the case here, the date of the EGM[5], so it would not be consistent with Delaware law even if it was consistent with Canadian law. It made no difference in *Integra* as apparently there was only a two day difference between the two dates.

15.    However, Justice Jones' dicta that one should disregard the effects of the merger on the diminution or enhancement of value attributable to the transaction as regards determining the fair value of the dissenters shares, is certainly correct[6].

16.    Mr Atherton QC's team produced a table which apparently lists every set of proceedings that has been commenced in the Cayman Islands under section 238 of the Companies Act. Of the 28 sets of proceedings commenced in or after 2015, they have been able to determine the valuation date in 17 of those cases. In every one of them, the EGM date was apparently adopted as the appropriate date for the valuation of the shares held by the relevant dissenters. In all these cases it is to be inferred that the date had been agreed and was not expressly considered by the Court, so the weight of these decisions can only be persuasive, not conclusive.

17.    I therefore do not go so far as Mr Atherton QC to say that these agreed directions, without any clear analysis or argument before the Courts, can be taken to amount to a 'settled practice'. However, I do agree that it is desirable for the Court to be consistent in its approach to the Valuation Date to promote certainty and confidence[7]. Consistency of approach obviously encourages parties to agree directions in proceedings, saving Court time and reducing costs. I agree with Kawaley J's observations in *Nord Anglia*[8] that the starting assumption should be that the approach adopted in previous section 238 cases will be of considerable assistance.

---

[5] *Delaware General Corporation Law,* Title 8, Section 262
and in *re Appraisal of Dell, Inc.* C.A. No. 11184-VCS (Del. Ch. 2017)
[6] See also *Qunar* 2019 (1) CILR Parker J §§ 38-42
[7] *Re Nord Anglia Education Inc.* (Kawaley J unreported, Grand Court of the Cayman Islands, 6 March 2018) §§ 8-10
[8] Ibid §10



18.     As the Chief Justice also observed *in Re JA Solar Holdings Co., Ltd. (*unreported, Grand Court of the Cayman Islands, 18 July 2019):

> *"The appropriate form of directions has been considered in a large number of the cases. The Court has now developed considerable experience of section 238 cases, and so, with the benefit of that experience, a relatively 'standard form' of directions has developed…"[9]*

19.     In *Re Qunar Cayman Islands Limited* (unreported, Grand Court of the Cayman Islands, 29 March 2021 Parker J), when dealing with the distinct issue of interest rates, the Court held that:

> *"…the settled practice of two first instance courts as upheld by the Court of Appeal should be followed by this court unless there are good reasons not to."[10]*

20.     I accept therefore that consistency with previous directions is important wherever possible, if the facts and justice of the case allow.

21.     In most cases, the relevant valuation date does not much matter. The EGM date and the merger completion date often coincide or are within a few days of each other.

22.     However, the relevant date can matter and apparently it does so in this case. As at the EGM Date, there was material uncertainty as to whether the transaction would complete due to the prospect of a key condition precedent not being satisfied and the almost three-month delay was due to the attempt to satisfy it. In fact, the condition was ultimately waived.

23.     The Dissenters have filed the Affidavit of Michael Thornton[11] which states: (i) that there was a gap of 2 months 27 days between the EGM and the actual merger; and (ii) that during that period, the trading price of the shares in Sina's subsidiary, Weibo, increased by approximately 14%.[12]

24.     The Court accepts that the movement in Weibo's shares is relevant, but it does not drive a conclusion as to the correct date upon which the shares are to be valued, even if the Court

---

[9] See also *Re eHi Car Services Limited* (unreported, Grand Court of the Cayman Islands, 24 February 2020) Parker J §§ 7,10 and 11.
[10] In that decision, the Court held that it was section 238 (5) which was the reference point from which interest should run (from the fair value offer date) which followed the date when the dissenters' rights are lost-see § 104-111.
[11] A partner at Grant Thornton UK LLP's valuation practice
[12] §§36 to 37



assumed market value is ultimately taken into account by the expert evidence directly, or as a cross check to other valuation methods.

25.    It is to be noted from the table produced by Mr Atherton QC's team that there were similar, or even greater, gaps between the date of the relevant EGM and the relevant merger transaction in other proceedings: *Qihoo 360 Technology Co Ltd*. - 3 months, 15 days; *Trina Solar Ltd*. - 2 months, 25 days; *JA Solar Holdings Co., Ltd* - 4 months, 4 days; *iKang Healthcare Group, Inc*. - 4 months, 29 days and apparently in each of these proceedings, despite the gap, the date of the EGM was, nevertheless, adopted as the appropriate valuation date.

**<u>Decision</u>**

26.    I approach the question of the correct approach in this case as a matter of principle and statutory interpretation, in accordance with the overall exercise the Court is engaged in of arriving at 'the fair value' for the Dissenters' shares.

27.    I bear in mind that one should disregard the effects of the merger on the diminution or enhancement of value to the Dissenters' shares attributable to the transaction and that the Court's function is to arrive at a just and equitable result on the facts of the case[13] . My approach is therefore akin to Mr Lowe QC's suggestion of a '*principled, fact-sensitive test'*.

28.    The valuation date is one of a number of matters of interpretation which arise under section 238 which need to be determined to arrive at the value which is "fair". There is, as I have noted, some importance to be attached to consistency of approach, allowing for some predictability for the parties, but each case will turn on its own specific facts and I therefore do not accept that the date is to be rigidly fixed for all cases. The overriding issue is to ensure that the date for valuation is, like everything else in the process of determination, fair.

29.    As acknowledged by Jones J in *Integra,*[14] the Companies Act does not specify the date on which the "fair value" of the Dissenters' shares is to be determined. Section 238(11) of the Companies Act simply provides that "*at the hearing of a petition, the Court shall determine the fair value of the shares of such dissenting members as it finds are involved….*".

---

[13] *Qunar* at §62, Parker J and Trina at §91 Segal J
[14] Ibid § 22

30.     Section 238 deals with the '*Rights of Dissenters'*. I have concluded that on a proper interpretation of the wording of section 238, "the fair value" of the relevant shares should be determined immediately before any vote of shareholders is held to consider (and if thought fit approve) any proposed merger i.e., as at the date of the EGM. It is at that stage that the merger price put forward is being considered by all shareholders in light of available information and advice.

31.     Moreover, the EGM is the date of the merger decision. It is the date pursuant to section 233(6) of the Companies Act when the plan of merger or consolidation is authorised by special resolution (i.e. a majority of two-thirds of the members)[15].

32.     However, whilst section 233 deals with general matters relating to Merger and Consolidation, I do not accept Mr Lowe QC's submission that section 233 is the governing section for determining the Valuation Date for assessing the fair value of the Dissenters' shares. He submitted that the other competing dates are section 233(9) when the plan is filed and more importantly section 233(11) when the registrar registers the plan which is when the merger is effective pursuant to section 233(13) (subject to any delay of the effective date under section 234). In my view, neither of those dates should govern the Valuation Date.

33.     I have concluded that the right to the determination of "the fair value" arises earlier than when the transaction completes (whether or not completion has been delayed as in this case). It arises under section 238 upon dissension from the merger proposal by those who wish to do so, and acceptance of the merger proposal by those who agree with it.

34.     The expressed intention of the Dissenters to invoke the entitlement to be paid "the fair value" for their shares crystallises immediately before the EGM by their objection to the merger[16] . It is at that stage that the shareholders are assessing their rights. As a consequence, it seems to me that this is the correct date on which the issue of "the fair value" should be determined i.e., the date of the EGM. Taking that point in time as the Valuation Date will not be affected by matters which relate to or may be attributed to the enhancement or diminution of value by reference to events which occur subsequently and are to have no part in the calculation.

---

[15] Section 60 of the Companies Act
[16] Section 238(2) of the Companies Act



35.     In the context of describing what exactly is being valued in a section 238 case, the Court held in *Qunar* [17] at § 52:

> *'I therefore consider the exercise is to value the shares as **at the valuation date (before the merger). This is what they possessed.** The dissenters have not been deprived of an interest in the assets or business undertaking of the company, but of their shares. It follows that one should look at the position of the dissenters with their minority share holdings at the valuation date' (my emphasis)*

*36.*    This is consistent with the Court of Appeal's approach (in the context of a minority discount) in *Shanda* [18]:

> *' For these reasons, it appears to me that section 238 requires fair value to be attributed to what the dissentient shareholder possesses.'*

37.     I reject Mr Levy QC's submission that the Valuation Date should be on the Merger Completion Date because it was only then that the Dissenters have made a final election and their shares were cancelled (depriving them of their rights as shareholders) and so the section 238 machinery was definitively triggered. I do not see any good reason why that should be the Valuation Date rather than the date when the merger decision was made.

38.     In any case I note that by virtue of section 238 (7) the member who has given a notice of dissent under section 238(5) ceases to have any of the rights of a member, except the right to be paid the fair value of his shares. This occurs *before* the completion date.

39.     The putative dissenter may change his mind in between the two dates (EGM and completion date), if they are different, but the merger decision date is the date on which his rights to dissent crystallise. I do not accept the submission that the trigger which "*sets the dissent process ball in motion is the section 238(5) notice*" as Mr Levy QC put it.

40.     Further, I do not find much assistance on this point from the English authorities Mr Levy QC referred me to in the context of unfair prejudice actions and insolvency cases either under schemes of arrangements or restructuring plans [19]. The unfair prejudice cases involved valuation of shares for a very different purpose and in the context of loss to shareholders as a consequence of the relevant conduct, or in respect of which, complaint is made. An element of the valuation

---

[17] 2019 (1) CILR Parker J
[18] 2018 (1) CILR p 352 § 50
[19] *London School of Economics* [1986] Ch 211; *Bluebrook* [2009] EWHC 2114 (Ch); *Virgin Active* [2021] EWHC 1246 (Ch)



therefore included aspects of the relevant conduct of which complaint is made and the specific facts. The valuation in the context of section 238 is a non-conduct specific, accounting/valuation-led exercise.

41.    The insolvency cases involve the valuation of the relevant company (not the shares) by reference to its assets and liabilities and against the prevailing circumstances of whether it is a going concern or in the context of the proposals of a scheme of arrangement against, for example, the prospect of administration or liquidation. What is fair in those contexts is not a sound basis for deciding what is fair in the section 238 context where the Court is engaged in a wholly different exercise.

42.    I also reject Mr Lowe QC's submissions that the Valuation Date should be the Merger Completion Date because a) it is the date which normally triggers the obligation by the relevant company to pay the dissenters fair value, having forced dissenters to elect to forfeit their shareholder rights and b) it is the date on which the majority of shareholders (and non-dissenting shareholders) 'reap the benefits of the merger' and therefore ought to be the date on which dissenters are also compensated.

43.    Section 238(1) provides:

> *A member of a constituent company incorporated under this Act **shall be entitled to payment of the fair value of that person's shares upon dissenting from a merger or consolidation.** (my emphasis)*

> Section 238(2) provides:

> *A member who desires to exercise that person's entitlement under subsection (1) shall give to the constituent company, before the vote on the merger or consolidation, written objection to the action.*

> Section 238 (3) provides:

> *An objection under subsection (2) shall include a statement that the member proposes to demand payment for that person's shares if the merger or consolidation is authorised by the vote.*

44.    It seems to me that section 238(1), (2) and (3) when read together make it clear that a member shall be entitled to payment of the fair value of that person's shares '*upon dissenting*' from a merger or consolidation by exercising an entitlement whereupon he '*shall*' give the Company, before the vote on the merger or consolidation, written objection to the action. '*Upon*



*dissenting'* from a merger is to be read as occurring when written objection is given, not at the later stages of the procedure.

45.     I see no good reason why the Merger Completion Date should take preference over the date when the dissenter has the right to make a written objection demanding payment for his shares and when the merger decision was made. It may be the case that the dissent is formalised later in the procedure, and that no rights are relinquished by the shareholders at that stage, but it is an entitlement which arises and can be commenced by written objection before the EGM.

46.     In my view, the date should be ascertained by reference to the date on which a vote was taken by all shareholders and it makes sense that the fair value is to be assessed at the same point in time and in the same circumstances as existed when the majority of shareholders voted to approve the terms of the merger, i.e., at the EGM.

47.     This is in my view, fair as between the dissenting shareholders themselves and fair as between the Company and the Dissenter groups and indeed all the shareholders.[20] They are all assessing their interests at one point in time for the purposes of approving or deciding to object. If, as in this case, there was an element of prediction in relation to conditions which needed to be satisfied before the transaction could complete, that would no doubt be taken into account in terms of assessing the fair value by the Court at that point in time.

48.     It appears that this is the first reasoned decision made after argument on the date of valuation in a section 238 case.

49.     I have taken note of the fact that apparently over half of the 28 cases since 2015 where the valuation date has been identified by Mr Atherton QC's team  have the same date of valuation as the EGM. This is only persuasive, but at least makes this decision consistent with those cases he referred the Court to.

50.     I should also state that I also bear in mind in coming to this conclusion that interest may be awarded on any amount determined to be payable to a dissenting shareholder as representing the fair value of the shares under section 238[21] which would mitigate to some extent any perceived unfairness or prejudice which is said to arise to a dissenting shareholder.

---

[20] See § 68 *Qunar* ibid '… *there is no premium to be awarded for dissent in and of itself which puts the dissenters in a better position than other shareholders who accepted the merger offer price'.*
[21] Section 238(11) of the Companies Act and *Re Shanda Games Limited* [2018 (1) CILR 352]



***The appropriate directions as regards discovery***

51.  Mr Atherton QC argues that the Company should be permitted an opportunity to seek regulatory approval from the relevant PRC authorities in relation to the provision of documents and information when complying with its obligations of disclosure as a matter of Cayman Islands law and procedure.

52.  He submits that, as a matter of the law of the PRC, the Company is required to seek regulatory approval before it is able to legitimately disclose documents and information of a certain type in this litigation as a consequence of the new PRC data protection legislation, in particular the new Data Security Law (the DSL), which came into force on 1 September 2021. In addition, the Personal Information Protection Law (the PIPL) came into force on 1 November 2021. These two new laws, along with the Cybersecurity Law (the CSL), which has been in force in the PRC since 1 June 2017, form the three pillars of data protection in the PRC, and together are referred to as the Data Protection Laws.

53.  There is significant uncertainty as to the application of the new legislation, and how it will operate in practice. This uncertainty, coupled with the significant penalties for breach and the likely interventionist attitude of the authorities is, Mr Atherton QC submitted, creating significant unease amongst PRC-based companies. The Company therefore proposes that it should be given an opportunity to seek that approval, and the timeline for disclosure should take this into account and should run from the date on which that approval is given.

54.  Mr Atherton QC emphasised that the Company is not seeking to avoid its discovery obligations. It does not contend that it should not be required to give disclosure of relevant documents and information; its position is simply that it must be given an opportunity to seek the requisite regulatory approval first.

55.  It recognises that its discovery and the production of material in this case is fundamental because it has the relevant information necessary for an independent evaluation by the Court with the assistance of experts.

56.  If approval is given there will not be an issue about the application or otherwise of PRC law. If no approval or limited approval is provided it is at that point that one can properly and appropriately undertake an exercise in examining the documents, the applicable provisions of PRC law and the risk of prosecution and the nature and extent of that risk.



57.     Mr. Levy QC started from the proposition that the Court should be wary of companies objecting to the giving of discovery in these types of cases. He argued that the burden is on the Company to establish that there was an established regime in place in the PRC which covers the relevant material and a real risk of prosecution as a result of an alleged breach of the PRC law. It had not discharged that burden on the evidence.

58.     He urged the Court to determine the question of whether the Company's evidence had satisfied the threshold breach question of the relevant PRC laws, taking into account the expert evidence submitted[22]. He submitted that it clearly did not. This is a threshold question in circumstances where the parties' experts differ as to whether the Data Protections Laws are engaged at all in the circumstances of this case in relation to disclosable documents. The differences are particularly marked in relation to Article 36 of the DSL, which Prof. Liu opines applies to any data which is stored in China, but which Mr Tang considers only applies to a judicial request to a PRC competent authority pursuant to, e.g., an international treaty.

59.     He argued that on each of the issues relating to: (a) Article 36 of the DSL, and (b) the need to carry out a security assessment, Mr Tang's views are preferable to Prof. Liu's.

60.     He submitted that even if the Court were to find that disclosure of the material in these proceedings would amount to a breach of the Data Protection Laws, the Court plainly has jurisdiction to order the Company to give discovery in the ordinary way, and will generally exercise its discretion so to order[23].

61.     He maintained that there is no doubt that the Court has the jurisdiction to order discovery even where discovery would put the disclosing party in breach of the Data Protection Laws. The Court has a discretion to do so.

62.     The Court will refuse to contemplate that its orders will not be obeyed by the disclosing party, and should be unmoved by any such indication on behalf of that party[24]. I should in passing make clear that there is no such indication by the Company in this case.

---

[22] The first affirmation of Prof. Han Liu dated 8 November 2021 on behalf of the Company; the first affirmation of Mr Zhihua Tang dated 25 November 2021 on behalf of the Dissenters; and the second affirmation of Prof. Liu served on 3 December 2021
[23]Matthews & Malek disclosure 5th edition para 8.26
[24] *Bank Mellat  v HMT CA* [2019]EWCA Civ 449



63.   Mr Levy QC went on to emphasise that the Company had not discharged its burden to show that if it were to make disclosure in these proceedings there is an actual risk of prosecution[25] by the PRC authorities for breach of the Data Protection Laws. Even where there is an actual risk of prosecution, that is not of itself determinative and the Court is entitled to conclude in an appropriate case that the needs of the litigant and the litigation for the production of the documents should trump the concerns as to the foreign law. [26]

64.   In addition, the Court may take into account the severity of the potential sanctions faced by the disclosing party in the event that it is successfully prosecuted.[27] As a matter of policy, the Court will be slow to permit its rules of procedure to be defeated on the basis of alleged foreign law restrictions[28].

65.   He urged the Court to make a disclosure order in the usual way in circumstances where section 238 case law has repeatedly stressed the central significance of company disclosure in the fair value context. He submitted that the Court can reasonably expect, as a matter of comity, that its orders will be borne in mind by the PRC authorities in deciding whether to prosecute a Cayman Islands incorporated entity for complying with a discovery order of this Court.

**Decision**

66.   I accept that experience suggests that companies in section 238 cases have a tendency to seek to provide more limited discovery than that which is sought by dissenting shareholders, and on occasion the Court has approached attempts to limit discovery by such companies with scepticism.[29]

67.   In my view, it is premature at this first Directions Hearing to be so sceptical in relation to this Company. It is in particular not necessary to rule now on the vexed question of whether the undoubted centrality of company discovery in section 238 proceedings and the Court's ability to determine fair value outweigh the concerns expressed by the Company as to PRC law.

---

[25] *Bank Mellat  ibid*
[26] *Tugushev v Orlov* [2021] EWHC 1514 Butcher J §38
[27] *Byers v Samba Financial Group,* Fancourt J [2020] EWHC 853 (Ch)
[28] *Byers v Samba Financial Group, ibid.*

[29] *JA Solar* ibid at § 30



68.     There is no question that the Company should be permitted (and encouraged) to continue with its attempts to obtain approval from the PRC authorities. In light of what it says are the potentially severe consequences for its business if it fails to obtain the necessary approvals, it is obvious that it should have the opportunity to do so.

69.     It may become necessary to deal with the conflicting opinions of the experts and to apply the relevant law to the facts of this case in due course, but in my view the matter is not yet to be determined. Suffice it to say that there is sufficient and cogent expert evidence adduced on both sides for the Court to say that the matter is validly raised and may well require judicial determination in due course.

70.     However, the need for an exercise in examining the documents, the applicable provisions of PRC law and the risk of prosecution and the nature and extent of that risk, has not yet arisen. The points Mr Levy QC so emphatically makes are not ripe for determination now at the relatively early stage of engagement with the relevant authorities, and it is therefore not appropriate in my view for the Court to rule on those arguments now.

71.     I am prepared to accept that Mr Atherton QC was not by way of the Company's evidence for the Directions hearing seeking to displace the tests Mr Levy QC propounded. However, by the same token the Company should not be permitted at this stage to provide advance 'carve outs' for its obligation to give discovery which may have to be addressed by the Court in due course. Nor should the Company's discovery timetable run from the date on which approval is given. I note that even the draft Order produced overnight by Mr Atherton QC to seek to find a compromise position, still contained a right to withhold documents for production unless and until regulatory approval was given, and is therefore not acceptable to the Dissenters.

72.     I have decided that I will make the usual order for discovery[30] leaving the onus upon the Company to comply or apply to the Court as soon as it perceives that it will not be able to do so for directions so that the matter may be determined within 70 days or shortly thereafter. The Dissenters are not to be prejudiced by undue delay.

73.     Moreover, the Court will not simply 'let the 'can' be kicked down the road' as Mr Levy QC put it. That would not be in accordance with the Overriding Objective. The Court is prepared

---

[30] At paragraph 8, the Company will give discovery within 70 days of the date of the Order in respect of both the specific categories of documents listed in Appendix 3, and of any additional documents that are relevant to the fair value determination.



to actively case manage the discovery process at the appropriate stage and to the extent necessary to ensure a fair trial of the one issue in the case; namely the fair value of the Dissenters' shares - which all parties accept requires access to all relevant information.

74.     Indeed, the importance of the Company's discovery in section 238 cases is beyond argument. The Court is heavily reliant on the evidence from the parties' valuation experts, and the experts in turn derive their opinions from documents and information in a company's possession in order to assist the Court to make a determination of the fair value of the dissenting shareholders' shares. Without the relevant company data, it is difficult to see how the Court could ensure a fair and proper trial in order to reach the fair value determination.

75.     Mr Atherton QC has told the Court that the Company is not sitting on its hands and trying to put off its discovery obligations. The Company's evidence is that its discovery exercise has been ongoing since June 2021 and has involved its lawyers in Shanghai in conjunction with the Company's e-discovery provider, Epiq[31].

*76.*     The process for seeking regulatory approval I have alluded to has started. On 28 October 2021, the Company wrote to the Beijing Municipal Cyberspace Administration seeking guidance on whether the Company will require approval before it can transfer documents and other information cross-border in these proceedings i.e., from the PRC to the Cayman Islands. That process should actively continue and it can reasonably be anticipated therefore that it will become apparent as to whether and if so in what respect the Court will need to make the determinations Mr Levy QC seeks.

*Practical suggestions*

77.     Mr Atherton QC pragmatically suggested that to ensure the process is not delayed and continues, a mirror data room could be created so that all the relevant material is uploaded in due course so that to the extent approval is given for some part or all of the material, it can be quickly uploaded and inspected. The Court finds this to be a sensible suggestion and would approve a provision in the Order to that effect.

78.     He also accepted that the Company would be prepared to update the Court from time to time on any material developments with the regulatory approval process and what can be achieved

---

[31] Affirmation of Victoria Ann Lord (sworn on behalf of the Company), 9 November 2021§7



within a reasonable timescale in terms of meeting its discovery obligations. The Court would endorse this approach and a reasonable mechanism for this should be incorporated in the Directions Order so that discovery is not unduly delayed and the process, at least from a timing point of view, may be monitored. It would also be appropriate for the Company to update the Dissenters and the Court as soon as reasonably practicable after receiving responses from the relevant regulatory authority.

79. If there are to be any redactions due to PRC law then there should be a provision whereby upon request: a) the parties should give reasons for a specific redaction and b) any document should be made available in unredacted form for electronic inspection by the parties' representatives within the PRC, subject to signature of an appropriate confidentiality and non-disclosure agreement.

*Whether the Company should be required to meet with the Dissenters, to discuss the parameters for its discovery exercise*

80. The Dissenters' proposed directions would require the Company to: (a) provide the Search Parameters it is proposing to adopt, (b) meet with the Dissenters to discuss the Search Parameters, and (c) notify the Dissenters of any variations it intends to adopt following those discussions.

81. The Company submits that such an obligation would be disproportionate and wasteful of costs. Mr Atherton QC submitted that it was a novel order, which has not been made in any previous section 238 proceedings, or, to the Company's knowledge, in any other proceedings in the Cayman Islands. He pointed out that the Dissenters do not propose any equivalent requirements for agreed custodians and keyword searches in relation to their own discovery obligations.

82. He referred to the *Qunar* case where the Court of Appeal drew attention to the danger that the Company disclosure process is pushed into the realm of the immaterial, the abusive, or otherwise 'weaponised':

> "*Finally, I refer briefly to two judgments of this Court of Appeal on the subject of disclosure in s238 proceedings, albeit judgments only at the permission to appeal stage. The first is In re Qihoo 360 Technology Co. Ltd ...where permission to appeal against disclosure by the company concerned was refused, but this court (Martin, Newman and Morrison, JJA.) ended by warning of the possibility of abuse by dissenters conducting a "drains up" inspection of the entire business, regardless of the relevance to fair value*"



> *(2017 (2) CILR 585, at para. 27). The second is to the permission to appeal*
> *judgment of Martin J.A. in this very case, where he repeated his concern about*
> *possible abuse by dissenters in their disclosure demands of companies, and*
> *was also clearly concerned in general that, in the light of a series of s.238*
> *petitions coming before the Grand Court, the Court of Appeal should have an*
> *opportunity to consider the proper parameters of the interlocutory stages of a*
> *s. 238 petition."*

The Court of Appeal emphasised the need for discovery in section 238 proceedings to be reciprocal.

83.     Mr Levy QC submits that it is reasonable for the Dissenters to require co-operation between the Company and the Dissenters as part of a good faith attempt to avert the prospect of further applications to the Court in respect of the Company's discovery.

84.     He further submitted that the apparent deficiencies in the processes adopted by the Company support making an order at this stage in the proceedings, and requiring its early engagement with the Dissenters.

85.     He went so far as to submit that the information sought by the Dissenters is essential given the opacity of the process adopted by the Company. He argued that it was plainly unsatisfactory and out of kilter with modern authority and international best practices for the Company to refuse to engage in respect of its *e-disclosure* exercise.

*Decision*

86.     I have reviewed the *inter partes* correspondence between July 2021 and October 2021 and have concluded there is no good reason at this stage to impose the requirements on the Company that the Dissenters argue for. Each party is to be, at least initially, trusted to conduct its discovery properly and to the extent another party has concerns about the adequacy of the disclosure process, it can challenge the exercise once it has reviewed the documents produced by the opposing party.

87.     I have come to the view that it is not necessary at this stage to make an order mandating the parties to cooperate in relation to the parameters of *e discovery* searches.



88.     In accordance with recent authority[32] the Court will however be ready to make such an order if and when required. I am not satisfied that there are deficiencies in the company's *e discovery* which require proactive engagement at this initial stage.

*Miscellaneous matters relating to information requests and management meetings*

89.     References below are to the draft of the Directions Order and appendices and my short decision is given after each issue.

   ***Paragraph 12****.* The Company has proposed wording requiring the Dissenters to notify it within 30 days of any access codes to the data room that are no longer required, and requiring Dissenters to reimburse the Company for the costs of any access codes that are requested by them but not used. This wording is aimed at saving unnecessary expense. The Dissenters propose 90 days.

*Decision*

In my view, 30 days is reasonable.

   ***Paragraph 22****.* The Company seeks the inclusion of wording providing that, if an Expert submits an Information Request whilst a previous request is outstanding, the time for responding shall run from the date the previous request is responded to. This wording is said to prevent the Company from having to respond to multiple requests for information at the same time.

*Decision*

   *Kawaley J* rejected a similar proposal in *Nord Anglia*:

        *'the efficiency of the trial preparation process would potentially be impeded if the Court were to impose arbitrary constraints on the number of questions which can be submitted at any particular time or within a particular period of time.*_"

   I rejected a similar proposal in *Ehi*:

---

[32] *Bitmain Technologies Holding Company* (Unreported, 3 August 2020), Segal J



> "It is also unworkable to order that they must wait for answers to be given before asking further questions. In my view that sort of order would be likely to cause uncertainty and give rise to disputes as to the experts' judgements and approach on these issues"[33] _

Once again I am not satisfied that the Company's proposal will lead to a fair or efficient process. If, for example, an expert submits a list of questions and subsequently he or she comes across an important matter requiring the Company's input, the expert would have to wait in order to get a response. The Court relies on the independent experts retained by the parties to assist the Court to act professionally, reasonably, and in accordance with the Overriding Objective. If they do not, either party may apply for further directions. That will likely cure any requests which are unfair or unnecessarily burdensome to comply with.

**Paragraph 23**. The Company seeks 21 days for responding to Information Requests and the Dissenters seek 14 days.

_Decision_

I see no good reason to depart from the standard period of time to respond to Information requests[34]. 14 days will be the time period.

**Paragraph 24.** The parties are agreed that, if an expert witness submits questions for a Management Meeting while an Information Request is outstanding, the period for responding to that Information Request should be suspended. The Company submits that the appropriate period for suspension is 14 days prior to the Management Meeting, whereas the Dissenters seek 7 days. The suggested period of 14 days if adopted will not unduly or materially prolong the pre-trial timetable.

_Decision_

I agree that 14 days would be reasonable in this case.

**Paragraph 26**. The Company suggests that the final day for submission of Information Requests should be 35 days prior to the exchange of Expert Reports; the Dissenters suggest it should be 21 days prior. The Company submits that 35 days is the more realistic period and

---

[33] §55, consistent with _JA Solar_ at § 80 and _Nord Anglia_ at § 28
[34] _JA Solar_ at § 81 and the Schedule



affords the (independent) expert witnesses a suitable amount of time from the last response to Information Requests to finalise their reports.

*Decision*

The cut-off date for the submission of the final Information Request should be 21 days prior to the exchange of expert reports. I see no good reason to depart from the standard period of time set out in previous cases[35]. Based on a 14-day period for the Company's responses to Information Requests, this provides 7 days for the experts to incorporate the Company's responses into their reports, should they choose to do so.

**Paragraph 28**. The Company proposes that no Management Meeting should be requested before the deadline for filing and service of the Company's reply evidence. It clearly makes sense for the Management Meeting to take place after the expert witnesses have had an opportunity to review the factual evidence in its entirety, as the evidence may raise issues that the expert witnesses may wish to discuss with management. The Company considers that it is important to afford the expert witnesses every reasonable convenience given their primary role is to assist the Court.

*Decision*

This seems sensible to me and I so order. I disagree with the Dissenters that this proposal is unworkable in circumstances where expert reports are due 98 days after reply evidence. A window of 28 days to hold the management meeting, and accommodate the attendees' schedules, should be sufficient with the necessary prioritisation in the relevant individuals' diaries.

**Paragraph 32.** There are two issues that arise in relation to this part of the proposed order for directions:

a)      The Company proposes that the expert witnesses should provide their List of Questions 21 days prior to the date of the Management Meeting. The Dissenters propose 14 days. The Company submits that, in light of the potential need to seek regulatory approval from the relevant PRC authorities, the longer period is more appropriate.

---

[35] *JA Solar* at §82 and Schedule showing previous cases



*Decision*

I agree with the Company that the regulatory circumstances it finds itself in may require an extra week. 21 days will be ordered.

    b)        The Dissenters seek the inclusion of the words, "*Either Expert may ask reasonable follow up questions at such Management Meeting to the extent they consider it necessary.*" The Company resists the inclusion of those words on the grounds that: (i) they are unnecessary and duplicative of the words in the next sentence, which clearly envisage that Experts may (and are entitled to) raise new questions; (ii) follow up questions may stray into the subject matter covered by the PRC Data Protection Laws, in which case answering them may expose the Company to sanctions; (iii) there is a danger of the Management Meeting turning into a deposition of Company management, which is something that should be avoided.

*Decision*

No good reason has been put forward by the Company as to why follow up questions may stray into areas which require a security assessment or regulatory approval. A similar objection to this wording was dealt with in some detail by the Chief Justice in *JA Solar*:

> "*I accept that it is important to allow for further questions to be asked after the parties have submitted their List of Questions and Issues*" (at [108]).

Similar wording was included in *Zhaopin* and *KongZhong* (quoted in *JA Solar* at §112). Again, there is no good reason to restrict the experts' ability to elicit information which may be relevant to the Court's determination of fair value from management during the meeting.

*Paragraph 36*. The Company proposes the inclusion of the words, "if any", to reflect the fact there may be no relevant documents to support the Company's clarification, correction or comment.

*Decision*

The parties agree that the Company should have an opportunity to clarify, correct or comment upon a statement or passage from the Management Meeting transcript before the expert reports are completed. If there is any supporting material for the clarification/correction/comment the

Company should produce it. The Company proposal of the additional words "*if any*" is not necessary.

**Paragraph 42 (c) -** Timing of exchange of signed expert reports

The Company seeks 14 weeks after the deadline for the Company's reply evidence.
The Dissenters seek 29 weeks after the date on which the parties have completed disclosure.

<u>Decision</u>

There seems to be no reason to fix this by reference to the completion of discovery. The deadline for reply evidence is the more appropriate fixed point as the experts will need to take account of the evidence in their reports.

**Appendix 6 –** Search Parameters Schedule

The Court has made a decision on the prematurity of a search parameters schedule.
The parties are encouraged to, in accordance with the Overriding Objective, agree any other of the time periods said to be at issue, without further troubling the Court.

**Costs**

The Court is minded to order that costs should be in the cause. I will determine the matter on written submissions if either party objects to this.

_____
**THE HON. JUSTICE PARKER**
**JUDGE OF THE GRAND COURT**