# EXHIBIT 8



IN THE GRAND COURT OF THE CAYMAN

ISLANDS FINANCIAL SERVICES DIVISION

**CAUSE NO. FSD 128 OF 2021 (RPJ)**

IN THE MATTER OF THE COMPANIES ACT (2021 REVISION)

AND IN THE MATTER OF SINA CORPORATION

---

## DIRECTIONS ORDER

---

**UPON** the Summons for Directions of the Petitioner (the "**Company**") dated 18 May 2021

**AND UPON** reading the First Affirmations of Victoria Ann Lord affirmed on 9 November 2021, the First Affirmation of Professor Liu Han affirmed on 9 November 2021, the First Affidavit of Moesha Ramsay-Howell sworn on 8 November 2021, the First Affirmation of Zhihua Tang dated November 2021, affirmed / notarised 3 December 2021, the First Affidavit of Michael Jonathan Thornton sworn on 30 November 2021, the Second Affirmation of Victoria Ann Lord sworn on 7 December 2021 and the Second Affirmation of Professor Liu Han affirmed on 6 December 2021

1

106-12680219-1



**AND UPON** hearing Leading Counsel for the Respondents being the  dissenting shareholders listed in Appendix 1 to this Order (together, the **"Dissenters"** and each a **"Dissenter"**), Leading Counsel for Dissenters 6 - 15 listed in Appendix 1 and Leading Counsel for the Company

**AND UPON** reading the supplemental written submissions of Dissenters 1 - 4 and 16 – 28 listed in Appendix 1

**IT IS HEREBY ORDERED THAT:**

1.      The dissenting shareholders listed in **Appendix 1** to this Order (together, the **"Dissenters"** and each a **"Dissenter"**) be joined as Respondents to the Petition.

**A.      Appointment of Experts**

2.      The Company and the Dissenters shall have leave to instruct and call as a witness at trial one expert witness each (any actively participating Dissenters jointly and severally to instruct one expert between them) in the field of valuation in order to opine upon the fair value of the Dissenters' shares in the Company as a going concern as at 23 December 2020 (the **"Valuation Date"**) (together, the **"Experts"**).

3.      The Experts shall be appointed by no later than 42 days from the date of this Order, and on that date the Company and the Dissenters shall each advise the other in writing of the identities and contact details including email addresses of the respective Experts so appointed.

4.      The parties shall have liberty to apply for leave to instruct and call as a witness at trial expert witnesses in such additional field(s) as they may be advised, provided that such application shall be made no earlier than 28 days after the deadline for filing and service of the Company's reply evidence pursuant to paragraph 38 below.

5.      The Company and the Dissenters shall have leave to instruct and call, at a hearing following the Court's determination of fair value (the "**Interest Hearing**"), one expert

witness each (any actively participating Dissenters jointly and severally to instruct one expert between them) to opine on the fair rate of interest for the purposes of section 238(11) of the Companies Act (2021 Revision) (together, the "**Interest Experts**"). For the avoidance of doubt, the same individual may be instructed and called as both a Valuation Expert and an Interest Expert. If the Company and the Dissenters, or either of them, consider an Interest Hearing necessary, the Interest Experts shall be appointed within 21 days of the date of the Order made upon the Court's determination of fair value of the Dissenters' shares in the Company, and on that date the Company and the Dissenters shall each advise the other in writing of the identities and contact details including email addresses of the respective Interest Experts so appointed. Absent agreement between the parties at that time, and notwithstanding the provisions of any other direction herein, any party shall have liberty to apply for further directions regarding the exchange of reports and supplemental reports from, and production of a joint memorandum by, the Interest Experts, and in relation to any other matters connected with determining the fair rate of interest.

**B.      Confidentiality and Non-Disclosure Agreement**

6.      No Expert or Expert's Appointee (being each person whom an Expert appoints to assist him/her in any work relating to the Proceedings, including the preparation of the Expert Reports and the Joint Memorandum (as defined in this Order) and any other preparations in relation to the Proceedings) (each an **"Appointee"** and collectively the **"Appointees"**), nor any Dissenters (including their agents, advisors, sub-advisors, representatives, affiliates and service providers and consultants, collectively their **"Representatives"**, excluding attorneys advising on Cayman Islands law), shall be given access to the Data Room (as defined below) until and unless each Dissenter and Expert enters into, and exchanges, a Confidentiality and Non-Disclosure Agreement in the same or substantially similar form attached to this Order as **Appendix 2**.

3



**C.**     **Electronic Data Room and Company Disclosure Procedure**

7.      Within 7 days from the date of this Order, the Company shall instruct a data room service provider to open an electronic data room (generally, **"Data Room"**) for the purpose of giving inspection of the documents discovered pursuant to this Order and, subject to paragraph 6 above, provide access to the Experts, the Appointees, the Dissenters, and their respective Representatives and legal advisors.

8.      Within 70 days from the date of this Order, the Company shall upload to the Data Room:

(a)     all documents (of whatsoever description, whether electronic, hard copy or in any other format) and communications (whether by email or otherwise) and other materials which are in its possession, custody or power comprising the categories of documents set out in **Appendix 3** of this Order which were prepared or created in the five year period ending on the Valuation Date and which are relevant to the determination of the fair value of the Dissenters' shares in the Company as at the Valuation Date; and

(b)     all additional documents (of whatsoever description, whether electronic, hard copy or in any other format) and communications (whether by email, WeChat or otherwise) and other materials which are in its possession, custody or power prepared or created in the five year period ending with the Valuation Date which are relevant to the determination of the fair value of the Dissenters' shares in the Company, as at the Valuation Date.

9.      The Company shall update the Court and the Dissenters:

(a) every 21 days from the date of this Order in relation to the status of regulatory approval process that it is undertaking to comply with its discovery obligations pursuant to paragraph 8; and

(b) as soon as reasonably practicable after receiving any responses from the relevant regulatory authority.

10.   The Company shall ensure that all relevant material is uploaded to a secure area of the Data Room prior to regulatory approval being granted, in order that it may be released to the Dissenters promptly once approval has been obtained.

11.   Where a party seeks to make redactions to documents uploaded to the Data Room, the parties shall give reasons for any specific redaction. If the reason for a redaction is due to a law of the People's Republic of China ("**PRC"**), upon request any document shall be made available in un-redacted form for electronic inspection by the parties' representatives within the PRC provided that those representatives have signed a Confidentiality and Non-Disclosure Agreement in a form acceptable to the disclosing party. Nothing in this paragraph shall prevent a party from challenging the right of another party to make such redactions.

12.   Unless the Dissenters establish their own Data Room in accordance with paragraphs 36 and 37 below, in which case the Dissenters will bear all the costs associated with their own Data Room[s], the costs of and associated with the establishment and maintenance of the Data Room, including the Data Room provider's costs of (a) uploading, processing and hosting the documents added to the Data Room, (b) producing the Data Room Index (as defined below) and any updated versions thereof, and (c) Experts, Appointees, Dissenters and Representatives seeking access to the Data Room, shall be costs in the proceedings. The Company agrees to bear such ongoing costs of the same while the proceedings are extant.

13.   Unless the Dissenters establish their own Data Room in accordance with paragraphs 36 and 37 below, the Company shall, on an ongoing basis whilst the proceedings are extant, bear the costs of nine access codes per Dissenter group (i.e. nine in total to each group of Dissenters represented by a single Cayman Islands law firm), and as many access codes as the Experts may require, to facilitate access to the Data Room (such costs ultimately to be

5

costs in the proceedings). At least two (2) business days prior to the end of each calendar month, each Dissenter group's Cayman Islands law firm shall inform the Company of any access codes not required by it for the next calendar month. If a Dissenter group requires access codes to be kept live but fails to use an access code for a period of 30 days, as advised to the Company by the service provider of the Data Room, then they shall be liable to reimburse the Company for the costs of those access codes at the conclusion of the proceedings. Should any Dissenter and/or its Representative(s) require additional access to the Data Room, such Dissenter shall bear the specific costs of such access, and the Company will arrange for such costs to be charged by the Data Room provider to the Dissenter directly.

14.     No Data Room usage report, or any other analysis of any party's usage of the Data Room, shall be run on the usage of another party without that party's express written consent or order of the Court.

**D.      Provisions Applicable to All Parties' Discovery; Lists of Documents; Translations**

15.     The parties shall comply with the disclosure protocol at **Appendix 5**. In relation to documents that have been redacted pursuant to Appendix 5, upon request, documents shall be provided in their native format manually amended by way of deletion of redacted information. All parties who have been given access to the Data Room shall be given full access rights to the documents therein, save that no party will have the ability to modify documents in-situ within the Data Room; however, all such documents shall be in a form which the parties and Experts can print and download to their own systems either individually or (upon request to, and facilitated by, the Data Room service provider) as a bulk download and, in turn, modify outside of the Data Room.

16.     Any document uploaded to the Data Room by any party that is an electronic image of a hard copy document containing text, shall be uploaded to the Data Room in a searchable format using optical character recognition.

6

17.    The parties will ensure that the documents they upload to the Data Room will be appropriately indexed in an electronically searchable form (the **"Data Room Index"**). The index shall be compiled in a manner which complies with the requirements for lists in Order 24, rule 5(1) of the Grand Court Rules (the "**GCR**"). This index shall be updated contemporaneously with any documents being added to the Data Room by any party. Any changes in the content of the Data Room shall be notified to the other parties as soon as practicable after they are made.

18.    In relation to the documents which are to be disclosed pursuant to this Order, the Company shall, within 14 days after the date for compliance with paragraph 8 above, and from time to time thereafter as may be necessary, file and serve on the Dissenters, and the Dissenters shall, within 14 days after the date for compliance with paragraph 36 below, and from time to time thereafter as may be necessary, file and serve on the Company, a list of documents complying with GCR O.24, r.5. So long as the Data Room Index has been provided in a manner which complies with the requirements for lists in GCR Order 24, r. 5(1), the Data Room Index shall be treated as each party's index of documents in accordance with GCR O.24, r.5 (1) and any documents that may fall within GCR O.24, rr.5 (2) to 5(4) shall be listed separately in accordance with Form No. 16 of Appendix 1 to the GCR. Nothing in this Order or in Appendix 2 hereto shall derogate from each party's implied obligation not to use the documents obtained thereby for any improper or collateral purpose.

19.    Where a document uploaded to the Data Room is not in the English language and the producing party has, or subsequently obtains, an English translation thereof, an electronic copy of such translation shall be uploaded by that party to the Data Room together with the source document, which shall be cross-referenced and/or linked to the translation.

20.    In the event that any party wishes to rely on a document which is not in the English language and a certified English translation is not available, that party shall procure and provide a certified English translation of the pages relied on at its own cost, an electronic

7

copy of which shall be uploaded to the Data Room as soon as practicable following the exchange of the Expert Reports (defined below) in accordance with paragraph 40 below.

### E.   Experts' Information Requests of the Company

21.   Unless the Court otherwise orders, the Company shall upload to the Data Room any additional information, documents (of whatsoever description, whether electronic, hard copy or in any other format), materials and communications (whether by email, or otherwise) and any other materials prepared or created for this purpose which are or have been in its possession, custody or power or information requested by either Expert which the Expert considers relevant for the purpose of preparing his/her own opinion **("Information Requests").** For the avoidance of doubt, if an Expert so requests, this may include documents, communications, materials or information produced after the Valuation Date. Such requests may be made from 14 days after the date on which the Company has completed its disclosure pursuant to paragraph 8 to 9 and the Dissenters have completed their disclosure pursuant to paragraph 36. Any Information Requests from an Expert and any responses from the Company thereto shall be in writing and shall be copied simultaneously by email to the Expert for the other party or parties to the email addresses notified in accordance with paragraph 3 above.

22.   The Experts' Information Requests shall be made periodically and the Experts shall use their best endeavours to submit only concise and clear questions.

23.   The Company shall provide written answers to each batch of Information Requests and shall upload the written answers and any other responsive documents to the Data Room as soon as practicable, and in any event (unless otherwise agreed) within 14 days of receipt of that Information Request. For the avoidance of doubt, should the Information Request be received by the Company after 5.30pm (Cayman Islands time), the timeframes for responding shall begin to run from 8.30am (Cayman Islands time) the following business day.

24.     If, during the running of any 14 day period under paragraph 23, either Expert submits questions for a Management Meeting pursuant to paragraph 25 then the running of that 14 day period shall be suspended for the 14 days leading up to the Management Meeting and during the Management Meeting.

25.     Unless otherwise agreed, the cut-off date for the submission of the final Information Request to the Company is 21 days before the date fixed for the exchange of Expert Reports (as provided for at paragraph 40(c) below).

**F.      Management Meetings**

26.     Within 21 days of a request by either of the Experts unless otherwise agreed or directed by the Court, the Company shall procure that appropriate members of its management team be available to meet with both Experts simultaneously, in person, by way of video or audio link, such meeting to be scheduled to take place at a mutually convenient place and time, for the purpose of providing information and answering queries which are relevant to the preparation of the Experts' respective Expert Reports (a **"Management Meeting"**).

27.     The number of Management Meetings requested by the Experts shall not be restricted, save that no Management Meetings may be requested by either of the Experts before the deadline for filing and service of Reply evidence or within 70 days of the Expert Reports being due to be exchanged, unless otherwise agreed between the parties or directed by order of the Court.

28.     The parties shall agree on the time and date, attendees, format (video conference, audio link or in person), and (if applicable) location for a Management Meeting.

29.     If agreement cannot be reached as to the time or date, attendees, format, language and/or location of a Management Meeting, either party may apply to the Court for directions on not less than 10 working days' notice to the other parties, such matter to be resolved by the Court on the papers unless the Court otherwise orders.

9

30.    Management Meetings shall be conducted in English. If necessary to facilitate proper participation by any member of the Company's management team, the Company shall arrange for interpreters to be present at Management Meetings. The costs of any interpreter shall be borne equally by the Company and the Dissenters (to be shared between them on a pro rata basis by reference to the number of shares they each held in the Company) and be paid within 14 days of receipt of invoices for the same. The parties may, in the alternative, agree to instruct their own interpreter(s) for a Management Meeting, in which case the Company and the Dissenters shall bear the costs of their own interpreter(s). The costs of all interpreters shall nonetheless be costs in the proceedings.

31.    Only members of the Company's management team, the parties' Cayman Islands legal advisers, the Experts (together with the Expert's team members) and any interpreters (if applicable) shall attend Management Meetings, save that any Management Meetings held by video or audio-link or held in person but for which it is possible to facilitate such links may also be attended by representatives of the Dissenters in an observatory capacity on such video link. Each party shall be responsible for the travel, visa, accommodation and other logistical arrangements of its Expert(s) and legal advisors in relation to Management Meetings and the costs thereof shall be costs in the proceedings. Each Expert shall provide a list of questions (**"List of Questions and Topics"**) to the Company not less than 21 days prior to the agreed date for a Management Meeting. The List of Questions and Topics shall be copied by email to the Expert for the other party or parties at such time as it is sent to the Company. Either Expert may ask reasonable follow-up questions at such Management Meeting to the extent that they consider it necessary. If an Expert wishes to raise a new question not included in the List of Questions and Topics, reasonable accommodation shall be made by the Company and agreement to provide a response shall not be unreasonably withheld.

10

32.    The Company shall arrange for Management Meetings to be recorded and a transcript prepared. Both the recording and the transcript shall be circulated to the parties and uploaded to the Data Room as soon as reasonably practicable thereafter and in any case within 14 days of the relevant Management Meeting. The cost of such recording and transcript shall be borne equally by the Company and the Dissenters (to be shared between them on a pro rata basis by reference to the number of shares each held in the Company). Such costs shall be costs in the proceedings.

33.    Within 14 days of uploading the transcript of a particular Management Meeting to the Data Room, the Company shall be permitted to consider whether there are any errors in the transcript and, if so, explain any such errors to the Dissenters and produce (or, if already produced and uploaded to the Data Room, identify) the supporting documents which demonstrate any such error. Within 7 days of providing notice of any purported errors and supporting documents, the Company shall circulate to the Dissenters and upload to the Data Room a copy of the transcript which identifies (a) any amendments agreed between the parties, and (b) any statements which the Company maintains are erroneous but which the parties have not agreed should be amended (the **"Reviewed Transcript"**) and the supporting documentation relied upon by the Company in support of its position.

34.    If an Expert proposes to place reliance on any specific oral statements made on behalf of the Company, or any passage from a transcript at a Management Meeting, in his/her report(s), the Expert shall afford the Company 14 days to clarify, correct or comment upon the relevant statement or passage, in writing, before the Expert completes his or her final report. The Company shall produce (or, if already produced and uploaded to the Data Room, identify) the supporting documents, which demonstrate any such error, clarification or comment.  The Expert is not required to explain how or why he/she intends to rely on the transcript extract(s).

11



35. To the extent he considers it appropriate to do so, an Expert may refer to information provided in a Management Meeting in his Report, the Joint Memorandum and/or Supplemental Report.

**G.    Dissenter Disclosure**

36. Subject to the Company entering into, and exchanging, non-disclosure agreements in the same or substantially similar form as that contained in **Appendix 2**, with the Dissenter as the disclosing party and the Company as the recipient, each Dissenter shall upload to the Data Room (or, if confidentiality and control terms cannot be agreed with the Company's Data Room provider, by way of an alternative data room) within the period specified in paragraph 8 of this Order documents falling within the categories of documents identified at **Appendix 4** of this Order which were prepared and created in the two year period ending on the Valuation Date and which are relevant to the determination of the fair value of the shares in the Company as at the Valuation Date. Each Dissenter's disclosure in the data room shall be available to the Company and the Experts but not to any other Dissenter.

37. The costs of hosting such documents in the Data Room (but not in an alternative data room, which costs shall be borne initially by the Dissenters on an ongoing basis, but shall ultimately be costs in the proceedings) shall be borne initially by the Company on an ongoing basis but shall ultimately be costs in the proceedings, and paragraphs 15 to 20 above shall apply in the same manner, and with the necessary modifications to give effect to those paragraphs, to the Dissenters' upload of documents to the Data Room. The Dissenters shall not be given access to each other's documents, but the Experts and the Company shall have access to all documents.

**H.    Factual Evidence**

12

38.   The Company shall file and serve any factual evidence by no later than 56 days after the date on which the Company has completed its disclosure pursuant to paragraph 8, and the Dissenters have completed their disclosure pursuant to paragraph 36 and any discovery to be given pursuant to foreign ancillary relief as contemplated in paragraph 46 has been completed. The Dissenters shall file any evidence in response by no later than 35 days of service of the Company's factual evidence upon them. The Company shall file any evidence in reply by no later than 14 days of service of the Dissenters' evidence upon it.

39.   Any factual evidence to be relied upon at the hearing of the Petition shall be given by affidavit or affirmation and leave is hereby granted to the parties to cross-examine any deponent of any factual affidavit or affirmation and the deponent(s) of any such affidavit(s) shall attend for cross-examination on the condition that notice requiring their attendance is given 14 days before the CMC (as defined below) or, if the CMC is dispensed with or the date of the CMC is fixed less than 14 days prior to the hearing of the CMC then the deadline shall be 30 days prior to trial.

I.   **Expert Reports and Joint Memorandum**

40.   Signed reports of each of the Experts (the **"Expert Reports"**):

(a)   Shall be confined to the issue of the fair value of the Dissenters' shares as a going concern in the Company as at the Valuation Date;

(b)   Shall comply with the Rules for Expert Witnesses in the FSD Guide; and

(c)   Shall be exchanged simultaneously 14 weeks after the deadline for the Company's reply evidence pursuant to paragraph 38 above, unless otherwise agreed by all parties.

41.   The Experts shall meet at a mutually convenient time, whether in person, by telephone, conference call or video link or howsoever they shall decide and so often as they jointly

13

consider necessary (the **"Experts' Meeting"**), but no later than 28 days after the exchange of the Expert Reports, to discuss the differences between their respective Expert Reports with a view to narrowing the issues between them and producing the Joint Memorandum required by paragraph 42 below.

42.   A joint memorandum of the Experts (the "**Joint Memorandum**") recording:-

(a)   The fact that they have met;

(b)   When and where they met, and that they discussed the Expert issues;

(c)   The issues on which they agree;

(d)   The issues on which they disagree; and

(e)   A brief summary of the reason for any such disagreement,

shall be completed and issued to the parties by the Experts by no later than 28 days following the Experts' Meeting.

43.   Any supplemental Expert Reports ("**Supplemental Reports**") shall be exchanged simultaneously by no later than 49 days following the issuance of the Joint Memorandum.

44.   The Company and the Dissenters shall each be at liberty to call as expert witnesses at trial their own appointed Expert whose report(s) have been exchanged pursuant to the provisions of this Order.

45.   The Company shall be at liberty to cross-examine the Dissenters' appointed Expert on his or her report(s) at trial, and the Dissenters shall be at liberty to cross-examine the Company's appointed Expert on his or her report(s) at trial.

**J.    Case Management, Case Management Conference and Trial Dates**

14

46.    If any party seeks foreign ancillary relief in aid of these proceedings, whether by way of third party discovery applications, applications in the United States of America under 28 U.S.C. s.1782, or otherwise, that party shall take the following steps so that the Court can ensure that any foreign ancillary relief can be accommodated in the timetable of these proceedings:

(a) as soon as practicable after bringing any such application, notify this Court, and the other parties to the proceedings, of the applications forthwith;

(b) as soon as practicable after any such application has been denied or granted, or discovery served pursuant to such application compelled or quashed, notify this Court and the other parties to these proceedings of that fact and, if the application has been granted and/or discovery has been served or compelled, of the relevant deadline for discovery;

(c) in the event that that party receives discovery pursuant to any such application, as soon as practicable after that discovery is received, and in any event within 4 days, upload the relevant documents to the Data Room and provide access to the other parties and their Experts.

47.    Unless the parties otherwise agree, a Case Management Conference ("**CMC**") shall be held on the earliest date convenient to the Court and the parties' Counsel after the deadline for exchange of any Supplemental Reports, or in the event that no Supplemental Reports are exchanged, on the earliest date convenient to the Court and the parties' Counsel once it is confirmed that no Supplemental Reports will be exchanged. The parties may agree that the CMC be dispensed with provided that the Court does not indicate a CMC is necessary.

48.    The Dissenters shall pay 50% of the reasonable cost of the recording and transcription of the hearing of the Company's Summons for Directions, the CMC and the hearing of the

15

Company's Petition, to be shared between them on a pro rata basis by reference to the number of shares they each held in the Company, subject to the parties agreeing on the supplier and fee quote prior to the hearing. Such recording and transcription costs for any party shall nonetheless be costs in the proceedings.

49.    For convenience only, the deadlines set out in various paragraphs in this Order are tabulated in a schedule attached to this Order as **Appendix 6**. To the extent there is any inconsistency between the terms of this Order and Appendix 6, this Order shall prevail.

50.    Save as varied by this order or further order, the practice and procedures set out in the FSD Guide are to be followed.

51.    Liberty for any party to apply for further directions in respect of the matters addressed in this Order and any other matters prior to the CMC.

52.    Within 28 days of the closing date for factual evidence in accordance with paragraph 38 above, the parties shall seek to agree a time estimate for trial and thereafter promptly write to the Court to fix the trial dates, with the trial to commence at least eight (8) weeks after the deadline for exchange of Supplemental Reports and subject to the Company's and the Dissenters' Counsels' availability.

53.    Should any Dissenters settle they shall inform the other Dissenters of the fact of such settlement within 24 hours of the execution of any deed of settlement or other formal resolution.

**K.**  **Costs**

54.  Costs in the cause.

Dated this 18th day of May 2022

Filed this  18th day of May 2022



_____

**THE HONOURABLE JUSTICE PARKER**
**JUDGE OF THE GRAND COURT**

THIS DIRECTIONS ORDER was filed by Harney Westwood & Riegels, Attorneys-at-Law for the Petitioner, whose address for service is 3rd Floor, Harbour Place, 103 South Church Street, PO Box 10240, Grand Cayman KY1-1002, Cayman Islands (Ref: 055301.0003 – KLP/ GMK/ MRH)

17

**APPROVED AS TO FORM AND CONTENT**

_____

**HARNEY WESTWOOD & RIEGELS**
Attorneys for the Company

_____

**MOURANT OZANNES**
Attorneys for Dissenters 1 -4

_____

**OGIER**
Attorneys for Dissenter 5

_____

**CAREY OLSEN**
Attorneys for Dissenters 6 - 15

_____

**COLLAS CRILL**
Attorneys for Dissenters 16 - 28

18

**Appendix 1**

**List of Dissenters**

|  | Name of Dissenter |
|---|---|
| 1. | Oasis Focus Fund LP |
| 2. | Oasis Investments Limited |
| 3. | Oasis Investments II Master Fund Ltd |
| 4. | Oasis Special Situations SPC – Gamma SP |
| 5. | Capital Ventures International |
| 6. | Camelot Event-Driven Fund, a series of Frank Funds Trust |
| 7. | Fulcrum Distressed Opportunities Fund III, LP |
| 8. | Sunrise Partners Limited Partnership |
| 9. | Stonehill Institutional Partners, L.P. |
| 10. | Stonehill Master Fund Ltd. |
| 11. | HCN LP |
| 12. | Bardin Hill Event-Driven Master Fund LP |
| 13. | APS Holding Corporation |
| 14. | Hildene Opportunities Master Fund II, Ltd. |
| 15. | George Town Holdings |
| 16. | FourWorld Special Opportunities Fund, LLC |
| 17. | FourWorld Global Opportunities Fund, Ltd. |
| 18. | Corbin ERISA Opportunity Fund, Ltd. |
| 19. | Corbin Opportunity Fund, L.P. |
| 20. | Pinehurst Partners, L.P. |
| 21. | Boothbay Diversified Alpha Master Fund LP |
| 22. | Boothbay Absolute Return Strategies, LP |
| 23. | QVT Family Office Fund LP |
| 24. | Athos Asia Event Driven Master Fund |
| 25. | Athos Special Situations Fund SPC - Athos Global Opportunities SP 1 |
| 26. | FMAP ACL Limited |
| 27. | 405 ACM Ltd. |
| 28. | Quadre Investments, L.P. |

**Appendix 2**

**Confidentiality and Non-Disclosure Agreement**

This Confidentiality and Non-Disclosure Agreement (the **"Agreement"),** effective [Date] (the **"Effective Date"),** is entered into

BETWEEN

**SINA CORPORATION,** a company incorporated under the laws of the Cayman Islands and having its registered office address at c/o Maples Corporate Services Limited, PO Box 309, Ugland House, George Town, Grand Cayman KY1-1104, Cayman Islands (the **"Company"**)

AND

[NAME], a company incorporated under the laws of [jurisdiction] and having its registered office address at [address] (the **"Recipient"),**

(each herein referred to individually as a **"Party",** and collectively as the

**"Parties").** WHEREAS

A.   On 23 December 2020, at an Extraordinary General Meeting, the members of the Company passed a resolution approving a proposed merger of New Wave Mergersub Limited (the **"Merging Company"**) with and into the Company pursuant to the Agreement and Plan of Merger dated 28 September 2020 by and among the Company, the Merging Company and New Wave Holdings Limited (the **"Merger"**).

B.   The dissenting shareholders of the Company identified in **Appendix 1** of the Directions Order (as defined herein) (each a **"Dissenter",** and collectively the **"Dissenters")** have dissented from the Merger pursuant to Section 238(5) of the Cayman Islands Companies Act (2021 Revision).

C.   On 18 May 2021, the Company petitioned the Grand Court of the Cayman Islands to determine the fair value of the Dissenters' shares in Cause No. FSD [ ] of 2021 ([ ]) (the "**Proceedings**").

D.    Pursuant to an order for directions in the Proceedings dated [date] (the "Directions Order"), the Company is to establish an electronic data room (the **"Data Room")** to which discovered documents are to be uploaded for the purposes of the Proceedings.

E.    The Company is engaged in proprietary and confidential business activities, and could be prejudiced if Confidential Information (as defined herein) pertaining to the Company or its business is disclosed publicly or to third parties, or used by the Recipient, its Representatives and/or Appointees (as defined herein) for purposes not reasonably related to the purposes of the Proceedings.

**NOW, THEREFORE,** in consideration of the promises and the mutual agreements and covenants hereinafter set forth, and intending to be legally bound, the Company and the Recipient hereby agree as follows:

## 1    DEFINITIONS AND INTERPRETATION

1.1    In this Agreement the following words and expressions shall have the following meanings:

(a)    **"Affiliates"** means a corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent or sibling corporation.

(b)    **"Appointee"** means each person whom an Expert appoints to assist him/her in any work relating to the Proceedings, including the preparation of the Expert Reports and the Joint Memorandum (such other terms as defined in the Directions Order).

(c)    **"Representatives"** means, with respect to a Recipient, its Affiliates, agents, advisers, sub-advisers, representatives, legal advisors, service providers and consultants.

1.2    References to recitals and clauses are references to the recitals to and clauses of this Agreement.

21

106-12680219-1

1.3     Headings to clauses and the use of bold type are for convenience only and shall not affect the interpretation or construction of this Agreement.

1.4     Words in the singular include the plural and vice versa.

## 2        CONFIDENTIAL INFORMATION

2.1     "Confidential Information" **means:**

    (a)     Any information disclosed by the Company to the Recipient, its Representatives and/or Appointees either directly or indirectly, in writing or orally, including but not limited to, information related to: trade secrets; business, commercial, or financial information; financial statements; financial or business plans and strategies; projections or analyses for future or prior periods; tax data; business and marketing plans and strategies; assets and liabilities; proposed strategic transactions or acquisitions, strategic alternatives, or business combinations; or other personally or commercially sensitive or proprietary information of the Company and its subsidiaries; and

    (b)     Any notes, analyses, compilations, studies, interpretations, documents or records containing, referring to, relating to, based upon or derived from, such Confidential Information, in whole or in part, created by the Recipient, its Representatives and/or Appointees.

2.2     Confidential Information shall not, however, include any information that:

    (a)     Was publicly known or made generally available to the public without a duty of confidentiality prior to the time of disclosure to the Recipient by the Company;

    (b)     Has become publicly known or made generally available to the public without a duty of confidentiality after disclosure to the Recipient by the Company through no action or inaction of the Recipient in breach of this Agreement; or

(c)     Is in the rightful possession of the Recipient without confidentiality obligations at the time of disclosure by the Company to the Recipient as shown by the Recipient's then contemporaneous written files and records kept in the ordinary course of business.

2.3     If the Recipient or its Representative becomes compelled by applicable law, rule or regulation or request of governmental or regulatory authority to disclose any Confidential Information, the Recipient will, insofar as it is permitted to do so by applicable law, rule or regulation and other than in the case of routine regulatory investigations, provide the Company with a written notice at least seven days in advance of such disclosure, where practicable and will provide such reasonable assistance to the Company as the Company may require at the Company's sole expense, in seeking a protective order or other appropriate remedy.

2.4     If the Company waives the Recipient's compliance with this Agreement or fails to obtain a protective order or other appropriate remedy, the Recipient will furnish only that portion of the Confidential Information that it is required to disclose by applicable law, rule or regulation provided that any Confidential Information so disclosed shall maintain its confidentiality protection for all purposes other than such disclosure compelled by applicable law, rule or regulation.

3       **MAINTENANCE OF CONFIDENTIALITY**

3.1     Except as may otherwise be agreed in writing by the Company or permitted by the courts of the Cayman Islands by way of relief from the implied undertaking, all Confidential Information and its contents received by the Recipient, its Representatives and/or Appointees shall be:

(a)     Maintained as set forth in this Agreement;

(b)     Disclosed only to such persons and in such manner as permitted by this Agreement; and

(c)     Used solely for the purposes of or related to the Proceedings.

3.2     Prior to its Representatives and/or Appointees being granted access to the Data Room and/or receiving the Confidential Information, the Recipient shall:

(a)     Ensure that its Representatives and Appointees expressly agree in writing to comply with the confidentiality terms imposed by this Agreement or are otherwise bound by confidentiality obligations no less restrictive than those contained herein; and

(b)     Confirm in writing to the Company that the agreements in clause 3.2(a) above have been obtained or obligation of confidentiality (as contemplated by clause 3.2(a) above) are otherwise in place.

3.3     The Recipient, its Representatives and its Appointees shall keep the Confidential Information confidential and shall not:

(a)     Disclose any Confidential Information or permit any Confidential Information to be disclosed, either directly or indirectly, to any third party (other than other Representatives or Appointees or Recipients who have signed a confidentiality agreement in this form and their Representatives or Appointees) without the Company's prior written consent; or

(b)     Use the Confidential Information for any purpose other than as set out at Clause 3.1 above or exploit the Confidential information in any way, including without limitation:

(i)     In any court proceedings commenced in any jurisdiction save for the Proceedings;

(ii)    In communications with any competitor or competitors of the Company or its subsidiaries or affiliates; and/or

(iii)   As a basis for trading in the securities of the Company or its subsidiaries or affiliates.

3.4    The Recipient shall take necessary measures to protect the confidentiality, and to avoid disclosure and unauthorised use, of Confidential Information. Without limiting the foregoing, the Recipient shall take at least those same measures it employs to protect its own confidential information.

3.5    The Recipient shall reproduce the Company's proprietary rights notices on any copies of documents, in the same manner in which such notices were set forth in or on the original.

## 4    BREACH OF CONFIDENTIALITY

4.1    The Recipient shall notify the Company of:

(a)   Any unauthorized use or disclosure, or suspected unauthorized use or disclosure, of Confidential Information by the Recipient, its Representatives and/or Appointees as soon as practicable upon becoming aware of such use or disclosure; and

(b)   Any actions by the Recipient, its Representatives and/or Appointees which are in breach of their respective obligations under this Agreement as soon as practicable upon becoming aware of such use or disclosure.

4.2    In the event of a breach of 4.1(a) and/or 4.1(b) of this Agreement, the Recipient shall reasonably cooperate with any and all efforts of the Company to help the Company regain possession of Confidential Information and/or prevent its further unauthorized use or dissemination.

4.3    The Recipient agrees to be responsible for any breach of this Agreement by any of its Representatives and/or Appointees that has received or obtained Confidential Information.

4.4     Nothing in this Agreement shall prejudice in any way the rights of the Company to file an application with the Cayman Islands court for a protective order relating to any Confidential Information. For the avoidance of doubt, any failure by the Company to obtain such an order or other protection after having a reasonable opportunity to do so shall not preclude the Recipient from making use of the Confidential Information in the Proceedings.

## 5     DESTRUCTION OF MATERIALS

5.1     Upon the earlier of (i) the final determination of the Proceedings (including all appeals therefrom), or (ii) a legally binding agreement having been reached between the Company and the Recipient as to the amount payable to it as a result of the Merger, and payment having been duly received by the Recipient (the "**Final Determination**") the Recipient shall upon request by the Company within 14 days of the Final Determination, take all reasonable and proportionate steps to:

   (a)     subject to clause 5.2, promptly destroy any materials that are in writing or other tangible medium or permanently erase any materials that are in an electronic or other non-tangible medium (to the extent technologically feasible) that constitute Confidential Information obtained or possessed by the Recipient;

   (b)     procure that any of its Representatives and/or Appointees destroy any materials that are in writing or other tangible medium or permanently erase any materials that are in an electronic or other non-tangible medium (to the extent technologically feasible) that constitute Confidential Information obtained or possessed by the Recipient's Representatives and/or Appointees

5.2     Notwithstanding the foregoing, one copy of the Confidential Information may be retained by the Recipient or its attorneys to comply with applicable law or regulation, provided that copies so retained shall continue to be treated as confidential in accordance with the provisions of this Agreement.

106-12680219-1

5.3     Notwithstanding the destruction or erasure of Confidential Information pursuant to this Clause 5, the Recipient and its Representatives shall continue to be bound by their confidentiality obligations and other obligations under this Agreement.

**6       INDEMNITY**

6.1     The Recipient shall indemnify the Company against all liabilities, costs, expenses, damages and losses suffered or reasonably incurred by the Company arising out of or in connection with any breach of this Agreement by the Recipient, its Representatives and/or Appointees.

**7       INADEQUACY OF DAMAGES**

7.1     The Recipient agrees that any violation of this Agreement may cause irreparable injury to the Company which cannot be adequately remedied in monetary terms or other damages, and accordingly the Company may be entitled to obtain injunctive relief, specific performance and/or any other equitable relief in addition to all other legal remedies concerning any threatened or actual breach of any of the provisions of this Agreement.

**8       TERM**

8.1     The obligations of the Recipient under this Agreement shall survive until 12 months following compliance with Clause 5 above. Notwithstanding the foregoing, the Recipient's duty to hold in confidence any Confidential Information that was disclosed by the Company during the term of this Agreement shall remain in effect for five years.

8.2     The termination of this Agreement shall not affect any accrued rights or remedies to which the Company is entitled.

**9       NO WARRANTY**

The company makes no warranties, express, implied or otherwise, with respect to non-infringement or other violation of any intellectual property rights of a third party or of the recipient.

10      **NO LICENSE**

This Agreement shall not be construed as creating, conveying, transferring, granting or conferring upon the Recipient any rights, license or authority in or to the Confidential Information except as expressly set forth in this Agreement. Title to the Confidential Information will vest solely with the Company.

## 11 MISCELLANEOUS

11.1.    This Agreement shall bind and inure to the benefit of the Parties and their respective successors and permitted assigns; except that the Recipient may not assign or otherwise transfer this Agreement, by operation of law or otherwise, without written consent of the Company. Any assignment or transfer of this Agreement in violation of the foregoing shall be null and void. The Recipient hereby represents and warrants that the person executing this Agreement on its behalf has express authority to do so, and, in so doing, to bind the Party thereto.

11.2.    This Agreement contains the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior written and oral agreements between the Parties regarding such subject matter.

11.3.    If any provision herein shall be determined to be void or unenforceable in whole or in part for any reason whatsoever such invalidity or unenforceability shall not affect the remaining provisions or any part thereof contained within this Agreement and such void or unenforceable provisions shall be deemed to be severable from any other provision or part thereof herein contained.

11.4.    No provision of this Agreement may be waived except by a written instrument executed by the Party against whom the waiver is to be effective. A Party's failure to enforce any provision of this Agreement shall neither be construed as a waiver of the provision nor

28

prevent the Party from enforcing any other provisions of this Agreement. No provision of this Agreement may be amended or otherwise modified except by a written instrument signed by the Parties to this Agreement.

11.5.   The Parties may execute this Agreement in one or more counterparts, each of which is deemed an original, but all of which together constitute one and the same agreement. This Agreement may be delivered by email or facsimile transmission, and email or facsimile copies of executed signature pages shall be binding as originals.

**12      GOVERNING LAW AND JURISDICTION**

12.1.   This Agreement and any dispute, claim, suit, action or proceeding of whatever nature (including non-contractual disputes or claims) arising out of or in connection with it or its subject matter or formation shall be governed by and construed in accordance with the laws of the Cayman Islands.

12.2.   Each Party irrevocably agrees to submit to the exclusive jurisdiction of the courts of the Cayman Islands over any claim or matter arising under or in connection with this Agreement or the legal relationship established by this Agreement; provided that nothing in this Clause 12 shall prevent a Party from seeking interlocutory or interim injunctive relief in other jurisdictions.

12.3.   Each Party irrevocably agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

**IN WITNESS WHEREOF,** the Parties acknowledge that they have read and understood this Agreement and have executed this Agreement as of the Effective Date.

29

106-12680219-1

| Signed for and on behalf of | ) | |
| SINA CORPORATION | ) | |
| by its duly authorised agent | ) | |
| | ) | Name: |
| | ) | Designation: |
| | ) | Date: |
| In the presence of: | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

Name:

Date:

| Signed for and on behalf of | ) | |
| [NAME OF RECIPIENT] | ) | |
| | ) | _____ |
| | ) | Name: |
| | ) | Designation: |
| | ) | Date: |
| In the presence of: | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

Name:

Date:

30

**Appendix 3**

**Categories of documents to be disclosed pursuant to paragraph 8 of the Order**

In this Appendix 3, the following definitions apply:

"Document" includes, without limitation, original, draft and all non-identical copies of all hard copy and electronically or digitally stored information, including all forms of correspondence, agreements, instant messages (including text messages, WeChat messages, WeCom messages, QQ messages, and WhatsApp messages), memoranda, calendars and other planners, records of telephone conversations, notebooks and all other forms of work papers, presentations, spreadsheets, graphs, charts, and any and all other forms of analyses.

"Communication" means any written, or electronic transmission of information (in the form of facts, ideas, inquiries, or otherwise), including all meetings, discussions, dialogues, conversations, telephone calls, interviews, negotiations, cablegrams, mailgrams, telegrams, telexes, cables, correspondence, facsimiles, emails, text messages, chat messages (including Bloomberg messages, Instant Bloomberg chats, WeChat messages, WeCom messages, QQ messages, and WhatsApp messages), or other forms of written interchange, however transmitted, including reports, notes, memoranda, lists, agenda, proposals, opinions, messages, video tapes, and other documents or records of communication.

Unless otherwise stated, the definitions in the Company's proxy statement dated 20 November 2020 (the "Proxy") are adopted herein below.

a.   Communications and Documents produced by, provided to or obtained from Morgan Stanley or its affiliates (the **"Financial Advisor"**) in relation to the merger, which includes all matters set out in the Proxy (including but not limited to the fair value opinion dated 28 September 2020 (the "**Fairness Opinion"**), Merger Agreement, Plan of Merger and Transactions) (the "**Merger"**), including those passing between the Financial Advisor and:

31

      i.    The independent directors or Special Committee of the Company;

     ii.    The Company's other directors, management, employees, counsel or advisors; and

   iii.    The Buyer Group and/or any of their respective advisors and/or representatives (the **"Buyer Group Team"**); and

   iv.   Any other potential purchasers.

b.    Any Communications with and Documents produced by, provided to or received by the Special Committee or its members in relation to the Merger.

c.    Any Communications and Documents in respect of the Company's decision to form the Special Committee, including the Company's choice of independent directors, and any Communications and Documents in relation to the appointment of Song Yi Zhang, Yichen Zhang and Yan Wang as directors of the Company (including Communications and Documents made and produced prior to their appointment) and any document analysing their independence as directors.

d.    Communications, Documents and other materials produced by, provided to, or communicated between employees, directors, management or consultants of the Company in the production and calculation of any projections sent to the Financial Advisor and Special Committee and any other sets of projections in existence (including, for the avoidance of doubt, in respect of any proposal).

e.    All Communications, Documents and other materials passing between the Company on the one hand and any member of the Buyer Group and the Buyer Group Team on the other.

f.    Communications, Documents, and other materials provided to or obtained from the Buyer Groups' financiers or prospective financiers (whether provided to or received from any of the persons mentioned in paragraph (a), (b) or (c) above or passing between such persons) for the purposes of securing finance for the merger transaction (by way of debt finance or equity capital contributions), undertaking due diligence on the Company and/or for negotiating the terms of the Merger (including those concerning price, structure or conditions).

106-12680219-1

g.   Communications and Documents which were provided to or obtained from any other interested buyer or their financiers or prospective financiers for the purpose of securing finance for a proposal, undertaking due diligence on the Company and/or negotiating the terms of a proposal (including those concerning price, structure or conditions).

h.   Communications, Documents and other materials relating to Weibo Corporation ("**Weibo**"), including:

    (i)   the Company's valuations or valuation analyses of Weibo and any financial statements of Weibo created or received in the five year period ending on the Valuation Date;

    (ii)   in relation to any proposed or potential sale of the Company's shares in Weibo and/or any proposed or potential privatization or delisting of Weibo, including Communications, Documents and other materials created by or passing between the Company, the Special Committee, the Financial Advisor, Weibo and/or New Wave (or any other member of the Buyer Group) in relation to the same; and

    (iii)   in relation to the indication from New Wave that it would not acquire the Company without Weibo and that it did not wish to break up the Company.

i.   Minutes and agendas of Board meetings and any supporting documentation and any other reports prepared for Board Meetings of the Company.

j.   Monthly management accounts for the Company.

k.   Consolidated quarterly accounts for the Company.

l.   Monthly and/or quarterly financials for the Company including, where available, profit and loss statements, balance sheets, cash flow statements and any accompanying notes, commentary, reports or business plans.

106-12680219-1

m.   Financial projections, forecasts, valuations, budgets, reports and models and supporting documentation including:

    i.   Internal long-term forecasts, budgets, projections, reports and models including source data and any supporting documentation;

    ii.   External forecasts, budgets, projections, reports and models relating to the Company's long-term plans including any supporting documentation;

    iii.   Any Communications or other Documents relating to the Company's projections (for the avoidance of doubt including but not limited to those Documents and Communications produced by, provided to, or communicated between, employees of the Company in the production and calculation of the projections sent to the Financial Adviser and any other sets of projections in existence; and

    iv.   Valuations or models of the Company (or any part of it, and whether for financial reporting, tax or investment appraisal purposes or otherwise) prepared by or for the Company, including any accompanying or supporting documentation and Documents provided to or obtained from any financial adviser in relation to any such valuation.

n.   Analyst, third party market and industry reports relevant to the markets in which the Company operates, other than those which are publicly available.

n.   Internal Documents relating to market share and commission broken down by business segment (where available).

o.   Internal Documents relating to any other potential acquisition of the Company considered by the Company's management.

p.   Agreements with the Company's major suppliers.

q.   Communications and Documents relating to any significant changes to the business of the Company or industry- related events that either had, or were perceived by the Company as having, a significant effect on the Company's long term projections.

r.   Communications and Documents relating to the value of investments including, but not limited to, all Documents and Communications:

   i.    related to the IPO and pre-IPO funding of Tusimple;

   ii.   related to any relisting or IPO of the Company, in the People's Republic of China or elsewhere, whether or not said potential relisting or IPO was ultimately pursued;

   iii.  supporting the values of loans and other receivables and liabilities of the Company; and

   iv.   relating to the value of any real estate holdings of the Company including but not limited to, valuations, lease agreements with tenants, investment plans or proposals.

s.   The number, terms and class of shares issued by the Company as at the Valuation Date and any changes thereto, and the terms and conditions of any outstanding share options of the Company as at the Valuation Date.

t.   Any Communications produced by, provided to or received from the Company and/or any of its shareholders in relation to shareholders' interests and incentives and exercise of shareholders' voting rights or voting agreements.

u.   Communications and Documents relating to any actual or potential significant transactions of the Company's shares.

v.   Documentation of any off-balance sheet or non-operating assets and liabilities of the Company, including pension liabilities.

w.   Advice or analysis relating to corporation tax, withholding tax or other tax prepared by or for the Company's management. Any communications and documents in relation to the engagement of, and provision of advisory services in relation to the Proposal and/or the Merger.

x.   Any Communications or Documents produced by, provided to, received from or communicated between directors, management or consultants of the Company in relation to the market price of the shares of the Company.

35

36

**Appendix 4**

**Categories of documents to be disclosed pursuant to paragraph 36 of the Order**

Documents/information which exist and are within the Dissenters' possession, custody or power in the period two years prior to the Valuation Date, which are relevant to the question of the fair value of the Dissenters' shares in the Company as at the Valuation Date and which fall within the following categories:

1.  All documents reflecting or relating to any valuations or similar analyses of the Company that the Dissenters prepared, reviewed, or considered, including but not limited to:

    a.  All written documents, including Excel files, that set forth, summarise, or otherwise reflect valuation analyses of the Company or Company's shares;

    b.  Any internal valuations of the Company or the Company's shares; and

    c.  Any valuations of the Company or Company stock reviewed or considered by the Dissenters in connection with the above.

2.  A list of any communications that the Dissenters had, whether in writing, electronically or verbally, with any representative of the Company prior to the date of the merger in relation to the value of the Company or its shares.

3.  Confirmation of the date the Dissenters purchased any or all of their shares in the Company, including the method of purchase.

4.  A schedule setting out the history of the Dissenters' trades in the shares of the Company.

5.  All documents, information and material issued or shared between the Dissenters' investment manager and/or investment advisor and the Dissenters' investment committee for their consideration of the Company's go-private transaction including file notes of meetings, meeting agendas and all forms of written communications.

106-12680219-1

**Appendix 5**

**Discovery Protocol pursuant to paragraph 15 of this Order**

**A.      Definitions**

1      **Metadata** means data about data. In the case of an electronic document, metadata is typically embedded information about a document that is not readily accessible once the native electronic document has been converted into an electronic image or paper document, for example, the date on which the document was last printed or amended. Metadata may be created automatically by a computer system (system metadata) or may be created manually by a user (application metadata).

2      **MD5 Hash Value** means the Message Digest algorithm 5 which is used to provide a 128-bit hash or "digital signature" for electronic documents and is generated upon the basis of the binary data of a file; where two or more items have the same MD5 Hash Value they are deemed to be duplicates.

3      **Native File Format** means an electronic document stored in the original form in which it was created by a computer software program.

4      **Parent Document** means a document with one or more attachment. For example, an email is a parent Document and any documents attached to the email are its attachments.

**B.      Preservation of documents**

5      The parties will take steps to preserve all potentially discoverable documents, including the metadata of such documents, and to ensure no metadata is altered during the preservation, collection, review or disclosure process.

**C.      De-duplication**

6      Stand-alone electronic documents or entire document families with the same MD5 Hash Value will be identified and any duplicates removed, except:

38

6.1     where duplicates are added to a party's List of documents (as defined by paragraph 31) because they are family members of other documents which are also disclosed. Duplicates which are part of a family are not to be removed, unless the whole of the family are in fact duplicates.

6.2     scanned hard copy documents.

7     A deNIST filter will be applied to the documents during processing to identify and remove files that are generally created by operating systems or applications and contain no user-generated information or data. The deNIST culling process identifies files found on the National Institute of Standards and Technology (**"NIST"**) list of documents that hold no value for litigation purposes.

## D.     Format

8     Electronic documents are to be provided in their Native File Format with all functionality, such as formulae and computations intact and enabled, and without watermarking, subject to:

8.1     documents, other than excel spreadsheets, that have been redacted in accordance with this protocol, which documents will be produced in Tagged Image File Format (**"TIFF"**) with the relevant .opt file and document ID coding;

8.2     Excel spreadsheets, that have been redacted in accordance with this protocol, which documents will be produced in a Native Format or near Native Format by using a software solution that retains the full functionality of the excel spreadsheet while applying redactions, such as Milyli, Evolver, or Redact Assistant.

9     All PDF and TIFF documents will be provided with corresponding document level OCR text files where possible. All PDF and TIFF documents will also be bates stamped with the document ID.

106-12680219-1

10      Each party will ensure documents are decrypted, or that passwords are supplied where possible and where available. To the extent encryption for documents cannot be successfully processed despite reasonable efforts, a slip sheet stating that the documents cannot be decrypted shall be inserted in its place, including the metadata required, to the extent it can be reasonably extracted from the file in its encrypted form.

11      Unless otherwise agreed or ordered by the Court, parties should not place any restrictions on documents that prevent opposing parties from accessing them.

12      Family-inclusive documents will be uploaded to the Data Room with metadata load files containing the family attachment range to allow linking of documents from the same family. Subject to any claim to privilege, all family documents are to be disclosed where only one member of a family Document is identified as relevant.

13      The following applies in relation to attachments to emails:

    13.1  Any document that is attached to or embedded within another document is to be classed as an attachment (unless an excluded document);

    13.2  Attachments must be listed as separate documents; and

    13.3  In general, attachments will appear immediately after the Parent Document in the parties' Lists of documents.

14      All parties who have been given access to the Data Room shall have full access rights to the documents therein, save that no party will have the ability to modify documents in-situ within the Data Room; however, documents shall be in a form in which the parties can download any versions of the documents (e.g. TIFF or native) either individually or (upon request to, and facilitated by, the Data Room service provider) as a bulk download and, in turn, modify outside of the Data Room.

**E.      Document Coding**

15      Parties are required to code documents in the Data Room by providing the following metadata detail for each Document, where such detail is reasonably available:

40

15.1   Document ID: The document ID must be a unique reference and begin with "*SINA-*" for the Petitioner and "*D01-*", "*D02-*", etcetera for the Dissenters based on the order in which they appear in **Appendix 1**. The document ID should be 8 digits in length following the party indicator, utilising zeros if necessary, e.g. SINA-00001234

15.2   Parent document ID: If there is no Parent Document, leave this field blank.

15.3   Last Modified Date: This should be the date and time last modified, or the manually coded date in the format DD/MM/YYYY, 00:00:00.

15.4   Date Created: This should be the original date and time a file was created and may be the same as the Last Modified Date.

15.5   Sent date: The date and time that the Document was sent in the case of an email and may be the same as the Date Created.

15.6   File name/subject/description: This may be the file name or subject line of an email or other descriptor.

15.7   Document title: The extracted title of the Document.

15.8   Document type: (ie. .pdf, .xls, .msg etc).

15.9   Sender/Author: The name of the author of a Document or sender of an email.

15.10   CC: The name of the recipient(s) of the Document in a CC. Use a semi-colon (;) symbol as the multi-value separator.

15.11   BCC: The name of the recipient(s) of the Document in a BCC. Use a semi-colon (;) symbol as the multi-value separator.

15.12   Recipient: The name of the recipient(s) of the Document. Use a semi-colon (;) symbol as the multi-value separator.

15.13   Custodian and Duplicate Custodian: The name of the custodian from whom the Document was drawn, and the names of any other custodians who had duplicate copies of the Document.

15.14   MD5 Hash Value: as defined.

15.15   Contains Redactions: This will be a binary "Yes/No" code applying where the whole or part of a Document has been redacted.

15.16   Reason for Redaction: This will identify the reason for the redaction using the following labels, as applicable:

41

(a)     Litigation privilege;

(b)     Legal professional privilege;

(c)     Without prejudice privilege:

(d)     State Secrets Laws (specifying the applicable law);

(e)     Confidential Communist Party Information Laws (specifying the applicable law);

(f)     China Cyber Security Law (specifying the applicable law);

(g)     PRC Data Security Law; and

(h)     PRC Personal Information Protection Law.

16     When a Document is uploaded to the Data Room it shall contain the above information and such information should be visible to users of the Data Room.

## F.     Excluded documents

17     Temporary internet files, cookies and irrelevant gif files (ie. company logos) are to be excluded from searches and discovery (to the extent possible).

## G.     Withholding Disclosure – Privilege

18     Nothing in this Protocol will prevent a party from withholding documents from production on the basis of any applicable Cayman Islands law.

19     If a claim of Cayman Islands law privilege is asserted over a portion of a document only, that portion will be redacted and the document produced.

20     The redacted sections of a document are to be identified as such either by being blacked out or by otherwise being marked as having been redacted and stating the reason for the redaction in the List of documents.

42

106-12680219-1

21 If a party asserts that a document is privileged and was uploaded inadvertently to the Data Room, then at the request of that party the Data Room service provider shall remove the document from the Data Room and no party shall make use of it or any information derived therefrom save with the express leave of the Court. Any request to the Data Room service provider under this paragraph shall be in writing and on notice to the other parties.

**H.** **List of Documents**

22 In their List of documents, the parties shall provide the following information to the extent that this information is reasonably available:

 22.1 Document ID;

 22.2 Parent document ID;

 22.3 Last Modified Date;

 22.4 Date Created;

 22.5 Email sent date;

 22.6 Conversion ID;

 22.7 Title/subject/description;

 22.8 Document type: (ie. .pdf, .xls, .msg etc);

 22.9 Sender/Author;

 22.10 Recipient;

 22.11 Contains Redactions;

 22.12 Reason for Redaction.

23 Each party reserves the right to reasonably request further information from the disclosing party in relation to specific document(s), other than those fields listed above.

24 Each party's List of documents will be ordered by family group, with attachments listed below Parent documents.

25 The parties' List of documents will be provided in an excel spreadsheet format (.xls).

43

**I.      Variation**

26      This protocol may be varied by agreement of the parties in writing or by order of the Grand Court of the Cayman Islands.

<br>

**Appendix 6**

**Schedule of Dates**

| | Description | Order (paragraph) | Reference | Days after Directions Order issued |
|---|---|---|---|---|
| **1.** | Directions Order (the "**Order**") issued | | - | 0 |
| **2.** | Company to open electronic Data Room | 7 | 7 days from date of Order | 7 |
| **3.** | Each party to appoint their respective Experts and to advise the other parties of the identities and contact details including email addresses of the respective Experts appointed | 2 | 42 days from date of Order | 42 |
| **4.** | Company to upload documents pursuant to **Appendix 3** as well as all additional documents, relevant to fair value | 8 | 70 days from date of Order | 70 |
| **5.** | Dissenters to upload Appendix 4 and other documents to Data Room | 38 | 70 days from date of Order | 70 |

44

| | | | | |
|---|---|---|---|---|
| 6. | Parties to file and serve lists of documents | 17 | 14 days from the date of disclosure | 84 |
| 7. | Experts may start issuing Information Requests to the Company | 21 | 14 days after the date on which the Company has completed its disclosure pursuant to paragraph 8, and the Dissenters have completed their disclosure pursuant to paragraph 36 | 84 |
| 8. | Company to upload written answers to an Information Request batches | 23 | Within14 days of receipt of that Information Request | |
| 9. | Filing and service of factual evidence | 38 | 56 days from the date on which the Company completes its disclosure pursuant to paragraphs 8 and 9 of the Order, and the Dissenters complete their disclosure pursuant to paragraph 36 and any discovery to be given pursuant to foreign ancillary relief as contemplated in paragraph 46 has been completed | 126 |
| 10. | Service of evidence in response | 38 | No later than 35 days of service of the Company's factual evidence | 161 |
| 11. | Service of evidence in reply | 38 | No later than 14 days of service of the Dissenters' evidence | 175 |
| 12. | Management Meeting | 26 | Within 21 days of a request by either of the Experts but not before the deadline for filing and | 182 |

45

| | | | | |
|---|---|---|---|---|
| | | | service of the Company's reply evidence | |
| **13.** | Cut-off date for final Management Meeting request | 27 | No later than 70 days of the Expert Reports being due to be exchanged | 203 |
| **14.** | List of Questions and Topics to be provided to the Company | 31 | Not less than 21 days prior to the agreed date for the Management Meeting | |
| **15.** | Cut-off date for the Company to upload the recording and the transcript of a Management Meeting to the Data Room | 32 | Within 14 days of the Management Meeting | |
| **16.** | Cut-off date for Company to provide comments on any errors in the transcript from a Management Meeting | 33 | Within 14 days of uploading of the transcript | |
| **17.** | Cut-off date for Company to upload an updated transcript to the Data Room | 33 | Within 7 days of providing notice of errors and supporting documentation | |
| **18.** | Cut-off date for Company to clarify, correct or comment in writing upon relevant statements or passages | 34 | Within 14 days upon notice from any Expert that he/she intends to rely on any specific oral statements made on behalf of the Company or any passage from a transcript at a Management Meeting | |

106-12680219-1

| | | | | |
|---|---|---|---|---|
| **19.** | Cut-off date for final Information Request from Experts to the Company | 25 | 21 days prior to the exchange of Expert Reports unless otherwise agreed | 238 |
| **20.** | Parties may apply for leave to instruct and call as a witness at trial expert witnesses in such additional field(s) as they may be advised | 4 | No earlier than 28 days following the Company's service of evidence in reply | 203 |
| **21.** | Experts to exchange their respective Reports | 40 | 14 weeks after the deadline for the Company's service of its reply evidence | 273 |
| **22.** | Experts' Meeting | 41 | Within 28 days of the exchange of Expert Reports | 301 |
| **23.** | Experts to issue their Joint Memorandum | 42 | Within 28 days of Experts' Meeting | 329 |
| **24.** | Experts to exchange their respective Supplemental Reports (if any) | 43 | Within 49 days of the Joint Memorandum | 378 |
| **25.** | Cut-off date for providing notice to any deponent of factual evidence for cross-examination at trial | 39 | Within 14 days of the CMC or, if the CMC is dispensed with or the date of the CMC is fixed less than 14 days prior to the hearing of the CMC then the deadline shall be 30 days prior to trial | |

47

| | | | | |
|---|---|---|---|---|
| **26.** | Case Management Conference | 47 | On the earliest date convenient to the Court and the Parties' Counsel after the deadline for exchange of any Supplemental Reports, or in the event that no Supplemental Reports are exchanged, on the earliest date convenient to the Court and the parties' Counsel once it is confirmed that no Supplemental Reports will be exchanged | |
| **27.** | Trial | 52 | At least 8 weeks after the exchange of Supplemental Reports and subject to the availability of Counsel | 434 |
| **28.** | Each party to appoint their respective Interest Experts (if necessary) and to advise the other parties of the identities and email addresses of the respective Interest Experts appointed | 5 | Within 21 days of the date of the Order made upon the Court's determination of the fair value of the Dissenters' shares in the Company | |

48